**Fonda MORGAN, Appellant**

v.

**Daniel GETTER, and A.G., a Child, Appellees.**

**No. 2013–SC–000196–DGE.**

Supreme Court of Kentucky.

Sept. 18, 2014.

Cynthia Ann Millay, Counsel for Appellant.

Blaine Jefferson Edmonds, III, Counsel for Appellee Daniel Getter.

Joshua Bryan Crabtree, Richard Alex Konkoly–Thege, Counsel for Appellee A.G., a Minor Child.

Amy Elizabeth Halbrook, Counsel for Amicus Curiae Amy Halbrook, Law Professor.

Bonnie Maryetta Brown, Counsel for Amicus Curiae Kentucky Chapter of The American Academy of Matrimonial Lawyers.

Opinion of the Court by Justice ABRAMSON.

As of January 1, 2011, when the Family Court Rules of Procedure and Practice (FCRPP) went into effect, Rule 6 provides that in family court actions involving a dispute over custody, shared parenting, visitation, or support, the parties may request, or the court on its own motion may order, among other things, the "appointment of a guardian *ad litem.*" What is the role of a guardian *ad litem* (GAL) in a custody, shared parenting, visitation, or support proceeding? In this custody modification action involving former spouses Fonda Morgan and Daniel Getter, the trial court appointed a GAL to investigate the situation, to file a report summarizing his findings, and to make a recommendation as to the custody issues raised by the parties. Because in its view the GAL was "like [the child's] representative," the court, however, did not allow the party who disagreed with the GAL's recommendation, Morgan, to cross-examine the GAL as a witness at the custody modification hearing. Ultimately, in accord with the GAL's recommendation, the trial court ruled against Morgan, changing custody to Getter. On Morgan's appeal, the Court of Appeals panel found the trial court's approach to the GAL's role in the proceeding troubling, but because the panel deemed harmless any error that may have arisen from the GAL's conflicting roles as both advisor to the court and representative of the child, it affirmed the trial court's Order without deciding whether an error had occurred.

We granted Morgan's motion for discretionary review to consider her claim that by allowing the GAL to testify, in effect, as to both facts and opinions through his recommendation to the court, but then disallowing Morgan's cross-examination of that testimony, the trial court violated her right to due process of law. We agree with Morgan that the trial court erred by allowing the GAL to serve as both an investigator for the court and an attorney for the child. Although the case has become moot by virtue of the child having

turned eighteen years old, we recognize that the proper role of a GAL is a recurring issue of considerable public importance and, as explained more fully below, we exercise our discretion to address that issue in the context of this case.[1]

### RELEVANT FACTS

By Decree entered in October 2003, the Family Court Division of the Campbell Circuit Court dissolved the marriage of Daniel and Fonda Getter (now Fonda Morgan). The Decree incorporated an agreement between the parties dividing their property and debts and naming Morgan sole custodian of the couple's two daughters, with Getter to have reasonable visitation. The agreement proved workable for a number of years (although Getter amassed a large debt for non-support), but in July 2011 Getter petitioned the family court to modify the custody arrangement. By then Getter had remarried and was living with his wife in Florida, where he worked as a truck driver. Morgan had likewise been remarried (twice), but was again divorced. She continued to reside in Dayton, Kentucky, a community where she and Getter had lived, and where her children attended school. The parties' older daughter, D.G., turned eighteen years old in July 2011 and at about that time moved to Tampa, Florida where she was to attend South Florida University, a college within an hour of Getter's Winter Haven, Florida home. Getter's July 2011 petition for custody of his younger daughter, A.G. (who was then almost sixteen years old), alleged a history of abuse by Morgan.

On August 15, 2011, the trial court appointed a GAL for A.G. by entry of an order stating simply that "a Guardian ad Litem is necessary to help the Court decide the case properly." In mid-October 2011, the GAL filed his report. It was largely based, according to the GAL, on his interviews with the parties and with A.G., and on his visit to Morgan's residence. For information regarding Getter's Florida residence, the GAL apparently relied on Getter and on A.G. Both parties admitted to the GAL having had altercations with A.G., each described the other's behavior as worse than his or her own, and each accused the other of trying to alienate A.G.'s affections. A.G. told the GAL that she wanted to live near her sister in Florida, and she described a volatile relationship with her mother. The GAL noted that A.G. had thus far been a successful student and appeared to be a highly motivated one. The GAL discounted Morgan's more serious accusations against Getter as belied by her having allowed A.G. to visit him, while also indicating serious concern regarding Morgan's admission that she shared her disparaging allegations about Getter with her daughters. Having considered all of these factors and satisfied that A.G. would continue to do as well in school in Florida as she had done in Kentucky, the GAL saw no reason why A.G.'s desires to be near her sister and away from her mother should not be respected. He recommended therefore, that A.G. should be allowed "the opportunity to live with her father."

The matter then came before the Campbell County Family Court on November 21, 2011. At the outset of the hearing, the court asked the parties to name the witnesses they expected to call, and Morgan informed the court that she intended to

---

1. We emphasize that this case concerns a KRS Chapter 403 custody proceeding and the new FCRPP 6. GALs are appointed in many other contexts—CR 17.04, for example, provides for the appointment of a GAL for adult prisoners and, of course GALs are very involved in dependency, neglect, abuse, and termination cases. Practice in those other contexts is not before us here.

call the GAL to question him about his report. The court advised Morgan that she would not be allowed to call the GAL as a witness, the GAL being "like [A.G.]'s representative." Morgan would, however, be allowed to challenge the report, in effect, by her questioning of the persons referred to in the report. Insisting that she had a right to question the GAL directly about his opinions and recommendation, Morgan then moved, if that questioning was not to be allowed, to strike the GAL's report. The trial court deferred ruling on that motion, and the hearing proceeded.

In addition to the parties and A.G., who all testified consistently with the GAL's report, the older daughter, D.G., testified that over a span of years she had witnessed a number of heated arguments between Morgan and A.G., the arguments on occasion involving harsh language or even blows. She also testified that Getter had never physically hurt her. One of Morgan's subsequent husbands testified that during his five-or-six-year marriage to Morgan, Morgan had seemed to him a good mother, and that he had never witnessed any physical violence between Morgan and her daughters. Morgan did not attempt to call the GAL as a witness, nor did she renew her motion to strike his report.

By Order entered December 19, 2011, the family court granted Getter's motion to modify the parties' custody of A.G., noting expressly the GAL's recommendation of that result. Finding, moreover, that Getter's establishment of an apparently stable home in Florida, D.G.'s move to a school near him, and A.G.'s experience of a deepening rift between herself and her mother were all material changes in the custodial

circumstances, the court concluded that A.G.'s relocation to Florida and residence with Getter "appears to be in the best interest of the child." Accordingly, the court ruled that "custody of the child is hereby modified to joint custody between the parties, with Petitioner [Getter] being primary residential custodian." A subsequent order specified in more detail how the parties were to divide parenting time with A.G.

Morgan appealed from the final Order and challenged in particular the trial court's denial of her request to cross-examine the GAL.[2] As noted, the Court of Appeals, although sharing the frustration many courts have expressed over the ambiguous role guardians *ad litem* often play in custody proceedings, concluded that in this case the GAL's contribution had not been decisive and so did not provide Morgan a ground for relief. Morgan then moved this Court for discretionary review, which we granted. Less than two months later, on August 2, 2013, before the parties' briefs had been filed, A.G. turned eighteen years old and thus ceased to be subject to the family court's jurisdiction. The first question we must face, therefore, and the question with which our analysis begins, is whether a case or controversy still exists for this Court to review.

## *ANALYSIS*

I. **Although This Case is Moot, Review is Called For and is Allowed as a Matter of Public Policy.**

 There is no dispute that, by virtue of A.G.'s age, Morgan's appeal is now moot. As our courts have long recognized, "[a] 'moot case' is one which seeks to get a judgment ... upon some matter which,

---

2. Morgan's appeal named only Getter as appellee. The GAL moved to intervene, and by Order entered August 31, 2012 the Court of

Appeals allowed the intervention. Only the GAL has participated as an appellee in the proceedings before this Court.

when rendered, for any reason, cannot have any practical legal effect upon a *then* existing controversy." *Benton v. Clay*, 192 Ky. 497, 233 S.W. 1041, 1042 (1921) (citation and internal quotation marks omitted; emphasis in original). Here, even were we to rule in Morgan's favor, the ruling would have no practical legal effect upon her controversy with Getter since the visitation order she seeks to have reconsidered expired when A.G. turned eighteen and can no longer be changed. See Kentucky Revised Statute (KRS) 405.020 (providing in pertinent part that parents retain legal custody of their child until the child turns eighteen years old). The general rule is, and has long been, that "where, pending an appeal, an event occurs which makes a determination of the question unnecessary or which would render the judgment that might be pronounced ineffectual, the appeal should be dismissed." *Louisville Transit Co. v. Dep't of Motor Transp.*, 286 S.W.2d 536, 538 (Ky.1956); *Choate v. Koorsen Protective Services, Inc.*, 929 S.W.2d 184 (Ky.1996); *Commonwealth, Kentucky Bd. of Nursing v. Sullivan Univ. Sys., Inc.*, 433 S.W.3d 341 (Ky.2014). The concern underlying this rule as to mootness is ultimately the role of the courts within our system of separated powers, a role that does not extend to the issuance of merely advisory opinions. *Commonwealth, Dep't of Corr. v. Engle*, 302 S.W.3d 60 (Ky.2010) (*citing In re Constitutionality of House Bill No. 222*, 262 Ky. 437, 90 S.W.2d 692 (1936)). *See also*, Robert J. Pushaw, Jr., *Justiciability and Separation of Powers: A Neo–Federalist Approach*, 81 Cornell L.Rev. 393 (1996) (discussing the development of the federal justiciability doctrines including that of mootness).

As with most general rules, however, there are exceptions to the general rule pertaining to mootness. Under the "collateral consequences" exception, for example, the expiration of a criminal sentence has been held not to moot an appeal from the judgment of conviction, because there remain consequences of the conviction (such as the loss of various civil rights) deemed sufficient to keep alive the appellant's personal stake in the outcome of the appeal. *Spencer v. Kemna*, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (discussing *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)). In *Caudill v. Caudill*, 318 S.W.3d 112 (Ky. App.2010), the Court of Appeals applied this exception to an appeal from a domestic violence order that expired during the pendency of the appeal. The exception has also been applied to appeals from civil involuntary commitment orders. *In re Alfred H.H.*, 233 Ill.2d 345, 331 Ill.Dec. 1, 910 N.E.2d 74 (2009).

■ Another exception to the general mootness rule is the "voluntary cessation" exception. *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Under that exception, an appeal may proceed notwithstanding the defendant's voluntary cessation of the challenged action, a primary concern being that a dismissal in those circumstances leaves the defendant "free to return to his old ways." 345 U.S. at 632, 73 S.Ct. 894. *See also Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196 (Tenn.2009) (collecting state cases applying or considering the voluntary cessation exception). A related concern is that parties should not be free to manipulate mootness so as to frustrate, after the investment of significant judicial resources, the "public interest in having the legality of the[ir] practices settled." *W.T. Grant*, 345 U.S. at 632, 73 S.Ct. 894. *See also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct.

1382, 146 L.Ed.2d 265 (2000). *And see,* Matthew I. Hall, *The Partially Prudential Doctrine Of Mootness,* 77 Geo. Wash. L.Rev. 562, 596–98 (2009) (discussing this aspect of the voluntary cessation exception). In light of this concern, this Court has issued opinions notwithstanding eleventh-hour settlements rendering, and often deliberately meant to render, the cases moot.

More often, however, exceptions have been recognized for cases which, although moot, concern alleged injuries or violations which are "capable of repetition, yet evading review," *Lexington Herald–Leader Co., Inc. v. Meigs,* 660 S.W.2d 658 (Ky. 1983) or which concern a "question [that] is of public interest." *Brown v. Baumer,* 301 Ky. 315, 191 S.W.2d 235 (1945). Although our cases have tended to conflate these two exceptions and to refer to both of them under the "capable of repetition" rubric, they have distinct, *albeit* overlapping, elements and should be distinguished.

■ The exception for cases "capable of repetition, yet evading review," has two elements: (1) the challenged action must be too short in duration to be fully litigated prior to its cessation or expiration, and (2) there must be a reasonable expectation that the same complaining party will be subjected to the same action again. *Philpot v. Patton,* 837 S.W.2d 491 (Ky.1992). In *Meigs,* for example, the trial court, prior to trial of a criminal case that had attracted a great deal of public attention, issued an order excluding the press from voir dire. Several newspapers brought suit challenging the order, but before their challenge could be fully litigated it was rendered moot by the completion of jury selection. Rejecting the contention that the case should be dismissed on that ground, this Court invoked the "capable of repetition" exception. Specifically, the

Court noted that (1) because voir dire typically occurs in a matter of a few days, at most, an order limiting the press's access will not be in effect long enough to permit challenges to be fully litigated; and (2) the newspaper-complainants were reasonably likely to be confronted with similar orders in other noteworthy cases. *See also, Bolton v. Irvin,* 373 S.W.3d 432 (Ky.2012) (declining to dismiss Commonwealth's appeal from moot ruling concerning district-court-imposed bail bond because district court bail-bond orders are routinely of short duration and because the issue was apt to confront the Commonwealth again).

In *Commonwealth v. Hughes,* 873 S.W.2d 828 (Ky.1994), on the other hand, the Court dismissed as moot an appeal by the Commonwealth from a writ prohibiting enforcement of a grand jury subpoena. The subpoena had become a dead letter because the issuing grand jury had been excused and the case had been resolved by guilty plea. Refusing to apply the "capable of repetition" exception, the Court explained that neither of the exception's elements was met. A special grand jury of indefinite duration could be impaneled, so as to insure that the matter could be fully litigated in a subsequent case. Moreover, the matter was not likely to confront the same complaining party again because the grand jury that had issued the subpoena had already been dismissed.

■ In this case, the GAL maintains that Morgan's claim does not come within the "capable of repetition" exception. We agree. Like the Commonwealth's claim in *Hughes,* Morgan's claim does not satisfy that exception's first element, *i.e.,* although *her* case expired before it could be fully litigated, there is every reason to expect that other cases raising the same questions about the proper role of a GAL will commence when the affected child is young enough to allow for the matter to be fully

litigated. Morgan's claim does not satisfy the exception's second element, either, because, although not impossible (through remarriage and/or adoption), it is not reasonably likely that Morgan will again find herself on the wrong side of a GAL-recommended child-custody ruling. Morgan's claim, unlikely to recur with respect to her and not evading review with respect to others, is thus not a viable candidate for the "capable of repetition" exception. The proper course for this Court in those circumstances is dismissal unless some other exception to the mootness rule applies. That brings us to the "public interest" exception.

As noted above, although our predecessor Court referred to "a question of substantial public interest" exception for moot cases, *Commonwealth ex rel. Luckett v. Helm*, 464 S.W.2d 260 (Ky.1971); *Brown*, 191 S.W.2d at 235, we have never discussed the contours of such an exception, and the cases in which it has been applied (aside from *Brown*)[3] have loosely employed the more common "capable of repetition" formula. Notwithstanding that formulation, we have on several occasions reviewed moot cases that did not satisfy the two elements of the orthodox "capable of repetition" exception, and thus, implicitly at least, have recognized a distinct "public interest" exception.

In *Woods v. Commonwealth*, 142 S.W.3d 24 (Ky.2004), for example, we reviewed a guardian *ad litem's* appeal, on behalf of his ward, from rulings authorizing the removal of life support from the ward, who had been left in a state of permanent unconsciousness following a heart attack. The ward died from natural causes during the course of the appeal, thus mooting the case, but the Court of Appeals, invoking the "capable of repetition" exception, deemed the case reviewable. We gave tacit approval to that ruling by providing our own review. Clearly, there was no chance that the ward himself would again be confronted by the challenged action (the removal of life support), and neither did the issue evade review, inasmuch as other patients on life support could be expected to survive until the matter was fully litigated. The case was reviewed, therefore, not in any strict sense under the standard "capable of repetition" exception, but rather because it raised issues of substantial public importance certain to be repeated with respect to other patients, their families, and their caregivers, and because guidance from the Court could properly be thought a matter of some urgency.

Similarly, if less dramatically, in *Rodney P. v. Stacy B.*, 169 S.W.3d 834 (Ky.2005) the Court invoked the "capable of repetition" exception to address a non-custodial parent's appeal from an order increasing his child-support obligation. Like this case, that case had been mooted by the child's turning eighteen years old, and also

---

**3.** *Brown* concerned an appeal by the Kentucky Alcoholic Beverage Control Board from a circuit court order compelling it to issue a wholesaler's license to Baumer. During the pendency of the appeal the Board complied with the order and issued the license. The appeal, it was argued, thereupon became moot. The Court recognized the general rule requiring dismissal "where pending on appeal an event occurs which of necessity renders any judgment that might be pronounced ineffectual for any purpose," 191 S.W.2d at 238, but it then noted that "[a]ll rules have exceptions; it is not every change in circumstances which renders a case moot so as to require a dismissal of appeal; one exception is where the question is of public interest." *Id.* Finding that the case involved a real, adversely litigated question of public interest, the Court stated that notwithstanding the rule against advisory opinions "we may go so far as to conclude that the chancellor was in error in overruling the Board's action in refusing to renew applicant's license." 191 S.W.2d at 239.

as in this case there was little chance that the appellant would himself face again the circumstances about which he complained. Nevertheless, review was deemed appropriate because the question raised was an important one of first impression and because it could similarly evade review when confronted by others whose children were nearing their majority.

In *Neidlinger v. Neidlinger*, 52 S.W.3d 513 (Ky.2001), one of the parties to a divorce action moved for an award of prospective attorney's fees so that she might retain counsel to represent her during the custody phase of the proceedings. The trial court denied the motion, and that ruling was one of several challenged on appeal. By the time it reached this Court the issue had been rendered moot: the woman had represented herself during the custody proceedings and so had not incurred attorney's fees, and the woman's only child had turned eighteen and so, as in this case, custody and support issues could not be re-litigated. Despite the fact that there was very little chance that the appellant would again have a need for custody-proceeding representation, the Court reviewed the moot issue because "whether a trial judge may order a party to a divorce proceeding to advance prospective attorney's fees to the other party is an issue 'capable of repetition, yet evading review.'" *Neidlinger*, 52 S.W.3d at 520.

As these cases illustrate, we have employed the phrase "capable of repetition, yet evading review" ambiguously, referring sometimes to the two-element mootness exception applied in *Meigs* and in *Hughes*, and sometimes to a mootness exception deemed applicable not because the issue was capable of being repeated with respect to the current appellant, but rather because the issue was thought to be an important one apt to arise and to evade review in other cases. This latter moot-

ness exception—an exception for questions of substantial public interest—was outlined in *Brown*, 191 S.W.2d at 235, and is recognized in many of our sister states. *See, e.g., Utah Transit Auth. v. Local 382 of the Amalgamated Transit Union*, 289 P.3d 582 (Utah 2012); *Putnam Cnty.*, 301 S.W.3d at 196; *In re Alfred H.H.*, 331 Ill.Dec. 1, 910 N.E.2d at 74; *Doe v. Doe*, 116 Hawai'i 323, 172 P.3d 1067 (2007); *Richie v. Bd. of Educ. of the Lead Hill Sch. Dist.*, 326 Ark. 587, 933 S.W.2d 375 (1996); *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191 (Alaska 1995); *Israel v. W. Virginia Secondary Sch. Activity Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989); *In the Matter of McLaughlin*, 100 Wash.2d 832, 676 P.2d 444 (1984); *In re William M*, 3 Cal.3d 16, 89 Cal.Rptr. 33, 473 P.2d 737 (1970).

Unlike the two-element "capable of repetition" exception, the "public interest" exception commonly has three elements, all of which must be clearly shown:

> The public interest exception allows a court to consider an otherwise moot case when (1) the question presented is of a public nature; (2) there is a need for an authoritative determination for the future guidance of public officers; and (3) there is a likelihood of future recurrence of the question.

*In re Alfred H.H.*, 331 Ill.Dec. 1, 910 N.E.2d at 80. Although our Kentucky cases that were in effect "public interest" cases focused largely on the first and the third of these elements, the second element should not be disregarded. As the Supreme Court of Illinois noted, if all that was required under this exception was that the opinion could be of value to future litigants, the exception "would be so broad as to virtually eliminate the notion of mootness." 331 Ill.Dec. 1, 910 N.E.2d at 81. To invoke this exception, therefore, the party asserting justiciability must

show, in addition to the public-question and likelihood-of-recurrence elements, that "there is a need for an authoritative determination for the future guidance of public officers." *See also, Putnam Cnty.,* 301 S.W.3d at 210–11 (discussing factors relevant to the public interest exception and noting that an important one is "the assistance that a decision on the merits will provide to public officials in the exercise of their duties"); *Doe v. Doe,* 172 P.3d at 1071 (noting that under the public interest exception, in cases where "the question involved affects the public interest and an authoritative determination is desirable for the guidance of public officials, [the] case will not be considered moot").

█ We are persuaded that those elements are present here and that the public interest exception to mootness implicit in our cases applies. Although the underlying case was a purely private custody dispute, the issue Morgan raises about the proper role of a GAL in such cases has been fully litigated and argued by adverse parties and poses a substantial question of a public nature certain to recur in many other cases. It is also likely, especially in cases involving older children, again to evade review. It is a question, moreover, currently pertinent to a substantial number of family court proceedings and an issue about which our circuit courts addressing custody matters would benefit from guidance. Finally, although not a necessary factor, we note that this is a question concerning a matter of procedure and procedural rules, the Court's own bailiwick, where there is the least danger with respect to the separation of powers from advisory opinions. Notwithstanding mootness, in sum, we are convinced that the role assigned to the GAL in this case, including the trial court's shielding the GAL from cross-examination, is a matter that we may and that we should exercise our discretion to review.

## II. The Role of the Guardian *Ad Litem* is Grounded in Both Custody Litigation and Guardian *Ad Litem* Practice in Other Contexts.

### A. Custody Disputes Have Come to Involve an Array of Aids For Determining the Best Interest of the Child.

Turning to the merits of Morgan's appeal, we note that this case can be approached from at least two perspectives: as a custody dispute between divorced parents or as a case involving a GAL. Custody disputes have long been recognized as not fitting neatly into our primarily adversarial system of dispute resolution. Janet Weinstein, *And Never the Twain Shall Meet: The Best Interests of Children and the Adversary System,* 52 U. Miami L.Rev. 79 (1997) (discussing the potential of adversarial proceedings to increase the conflict between divorcing spouses with adverse consequences for their children). Our legal system generally relies on the contending parties to represent, through the presentation of evidence and legal argument, their own interests. Ellen E. Sward, *Values, Ideology and the Evolution of the Adversary System,* 64 Ind. L.J. 301 (1989) (describing our system and contrasting it with the inquisitorial system prevalent in Europe) (Sward). But in contested custody proceedings there is no guarantee that the parties' presentations will thoroughly represent the interests of the children who are at the center of the matter. Recognizing this potential problem, the General Assembly, as long ago as 1946, authorized Kentucky counties to provide for the appointment of a "friend of the court," a licensed practicing attorney, who, among other duties, in contested custody cases could, if so requested by the trial judge,

> make such investigation as will enable the friend of the court to ascertain all facts and circumstances that will affect

the rights and interests of the children and will enable the court to enter just and proper orders and judgment concerning the care, custody, and maintenance of the children. The friend of the court shall make a report to the trial judge, at a time fixed by the judge, setting forth recommendations as to the care, custody, and maintenance of the children.

KRS 403.090.[4] The friend of the court was not to represent either party, but could represent the children to the extent of asking questions at depositions and filing interrogatories. The friend of the court's compensation was to come from the authorizing county. *Id. See* Delmer D. Howard, *"Friend of the Court,"* 45 Ky. L.J. 128, 128 (1956–57) (discussing the advent of this statute and noting that it was in part a response to courts' becoming aware "of the need of an investigative officer to represent the children in contested divorce cases where it was apparent that the parties were prone to exaggerate the favorable conditions of each home.")

With the adoption in 1972 of the Uniform Marriage and Divorce Act, with its no-fault approach to divorce and its mandate that in contested custody proceedings courts are to "determine custody in accordance with the best interests of the child," KRS 403.270(2), the General Assembly expanded upon the earlier statute by providing that in such proceedings "the court may order an investigation and report concerning custodial arrangements for the child. The investigation and report may be made by the friend of the court or such other agency as the court may select." KRS 403.300(1). Provided the parties were given adequate notice of it, the inves-

tigator's report could be received in evidence at the custody hearing, but then "any party to the proceeding" could "call the investigator and any person whom he has consulted for cross-examination." KRS 403.300(3).

Consistent with its overall aim of "reduc[ing] the adversary trappings of marital litigation," *Uniform Marriage and Divorce Act* (U.L.A.) prefatory note, p. 149 (West Publishing Co.1987), the Uniform Act also authorizes a court determining custody to "interview the child in chambers to ascertain the child's wishes as to his custodian and as to visitation," KRS 403.290(1), and to "seek the advice of professional personnel, whether or not employed by the court on a regular basis." KRS 403.290(2). The parties must be apprised if the court makes such inquiries, KRS 403.290(1) and (2), and "may examine as a witness any professional personnel consulted by the court," KRS 403.290(2). Thus, unlike the usual civil proceeding in which the court relies and is expected to rely solely on the evidence presented by the parties, custody proceedings depart from that model. Under the Uniform Act, the court in such proceedings is free, like judges in the inquisitorial European courts, Sward, *supra*, to seek out information on its own behalf. According to the Act's commentary, all of these provisions allowing the court to make inquiry, either directly or through an investigator, were "designed to permit the court to make custodial and visitation decisions as informally and non-contentiously as possible, based on as much relevant information as can be secured, while preserving a fair hearing for all interested parties." *Uniform Marriage and Divorce*

---

4. Although KRS 403.090 remains in effect, it appears to have lapsed largely into a state of disuse, likely as a result of the fact that child-support enforcement, which was the friend-of-the-court's primary duty, has been assumed by the County Attorney, as well as by the reluctance or inability of our counties to fund the position. The one exception regarding county-funded friends of court appears to be in Fayette County.

*Act* (U.L.A.) § 404, comment (West Publishing Co.1987).

Significantly, however, in its adoption of the Uniform Marriage and Divorce Act, our General Assembly omitted that Act's section 310, which provides that

> [t]he court may appoint an attorney to represent the interests of a minor or dependent child with respect to his support, custody, and visitation. The court shall enter an order for costs, fees, and disbursements in favor of the child's attorney. The order shall be made against either or both parties, except that, if the responsible party is indigent, the costs, fees, and disbursements shall be borne by the [appropriate agency].

*Uniform Marriage and Divorce Act* (U.L.A.) § 310 (West Publishing Co.1987). The General Assembly did not provide an explanation for the omission, but plainly anticipated that generally the court, through the parties and through its own inquiries, would be able to ascertain the interests of dependent children without burdening the parties or the proceeding with a child's attorney.

The family law revolution did not stop with the Uniform Act, of course. From House Concurrent Resolution (HCR) 30 (1988), establishing the Family Court Feasibility Task Force, through the many Family Court pilot projects of the 1990s, to the 2002 amendment to section 112 of the Kentucky Constitution allowing for the designation of family court divisions within the circuit court, Kentucky has moved toward a unified family court, a court specializing in, and with jurisdiction to address, a broad array of legal problems confronting families. *See* KRS 23A.100 (establishing family court jurisdiction over family-related matters ranging from paternity determinations to marriage dissolutions to juvenile status and dependency actions to termination of rights and adoption proceedings). These "new" family courts are administratively capable of providing a coordinated response when families find themselves before the court with respect to multiple matters, such as a dissolution action ongoing while a teen-aged child has a status offense. *See* Erin J. May, *Social Reform for Kentucky's Judicial System: The Creation of Unified Family Courts,* 92 Ky. L.J. 571 (2004) (discussing as a principal motivation for the family-court movement the redundancy and inconsistency that resulted when jurisdiction over family matters was divided among different courts). Unified family courts, with their holistic approach to families (the one-family one-judge idea), their alternatives to litigation (mandated or encouraged mediation, for example), their involvement with other social service providers (often facilitated by a family court judge's on-staff support worker), and what are often less formal proceedings (including, for example, the relaxation of evidentiary rules) have been hailed as the providers of "therapeutic justice," as problem solvers and conflict mitigators for families suffering from underlying dysfunctions. Simply put, these courts are not mere umpires or dispute deciders. John Lande, *The Revolution in Family Law Dispute Resolution,* 24 J. Am. Acad. Matrim. Law 411 (2012); Jana B. Singer, *Dispute Resolution and the Post-divorce Family: Implications of a Paradigm Shift,* 47 Fam. Ct. Rev. 363 (2009). Perhaps not surprisingly, family courts have also been criticized as straying far from the role intended for courts in our typically adversarial system of justice and, in the process, compromising parents' rights. Jane C. Murphy, *Revitalizing the Adversary System in Family Law,* 78 U. Cin. L.Rev. 891 (2010); Gerald W. Hardcastle, *Adversarialism and the Family Court: A Family Court Judge's Perspective,* 9 U.C. Davis J. Juv. L & Pol'y 57 (2005).

In Kentucky, the family court experiment remains a work in progress. Currently, over half of Kentucky counties have family court divisions. In 2011, as noted above, the family court acquired its own Rules of Procedure and Practice (FCRPP). Part III of the FCRPP addresses "Custody, Shared Parenting, Visitation and Support" within the context of marriage dissolution. Rule 6 of Part III, "General Provisions," provides that

> A parent or custodian may move for, or the court may order, one or more of the following, which may be apportioned at the expense of the parents or custodians:
>
> (a) A custody evaluation;
>
> (b) Psychological evaluation(s) of a parent or parents or custodians, or child(ren);
>
> (c) Family counseling;
>
> (d) Mediation;
>
> (e) Appointment of a guardian *ad litem;*
>
> (f) Appointment of such other professional(s) for opinions or advice which the court deems appropriate; or,
>
> (g) Such other action deemed appropriate by the court.

FCRPP 6(2). Although the rule allows for the appointment of a guardian *ad litem,* the Rules nowhere define that term or specify what role or roles a guardian *ad litem* may play in a dissolution proceeding.

**B. Guardians Ad Litem Have Come to Play a Significant, if Ambiguous, Role in Family Court.**

We are brought thus to the GAL aspect of this case, and that aspect, too, has an historical context. While we can again do little more than touch on some of the highlights of that history, that background is necessary to orient our discussion. The term "guardian *ad litem*" is very much a chameleon. According to one commentator, the term is employed in all of the United States' fifty-six jurisdictions, but in no two of them does it have exactly the same meaning. Katherine Hunt Federle, *The Curious Case of the Guardian Ad Litem,* U. Dayton L.Rev. 337, 348 (2011). The Uniform Marriage and Divorce Act avoids the term, and the American Bar Association, in its 2003 Standards of Practice for Lawyers Representing Children in Custody Cases, rejected the term as hopelessly ambiguous and confusing. Linda D. Elrod, *Raising the Bar for Lawyers Who Represent Children: ABA Standards of Practice for Custody Cases,* Fam. L.Q. 105, 115–16 (2003) (Elrod) (describing the drafting of the custody standards). Broadly speaking, a "guardian" is an individual or corporation appointed by a court to care for the person and to "guard" the estate of a minor or other legal incompetent. *See* KRS 387.010(3) (defining "guardian" in the context of trust and estate administration). A guardian *ad litem* (a guardian for the purposes of suit or litigation), is then, broadly, a person appointed by a court to appear on behalf of, to "guard," a minor (or other incompetent) in a lawsuit. Much of the guardian *ad litem* problem in custody proceedings arises from the different roles this broad notion can be thought to comprise and uncertainty about which of those roles is being invoked. As commentators have noted, a "guardian *ad litem*" has been variously defined as

> (1.) the person appointed by the court to serve as an investigator to gather information about the parents and the children and report back to the court recommending which parent should have custody; (2) the lawyer appointed to represent the children; (3) an advocate for the 'best interests' of the children; (4) a facilitator/mediator; and (5) some combination of the above and more.

Raven C. Lidman, Betsy R. Hollingsworth, *The Guardian Ad Litem in Child Custody Cases: The Contours of Our Judicial System Stretched Beyond Recognition,* 6 Geo. Mason L.Rev. 255, 256–57 (1998) (citations omitted).

Kentucky law has not yet squarely addressed these concerns. Under the Civil Code of Practice, the precursor of our Kentucky Rules of Civil Procedure (CR or Civil Rules), when an infant was sued in this state and lacked a guardian to see to his or her defense, the court was to appoint a guardian *ad litem.* As our predecessor Court explained,

> He [the guardian *ad litem* ] is appointed to represent defendants who are under legal disability and is given the duty to 'attend properly to the preparation of the case' in their behalf.... No judgment can be rendered until he has made defense where the wards have no legal guardian or committee.... It seems that under the common law and perhaps in some other jurisdictions a guardian ad litem need not be an attorney and may employ counsel, but with us it is presupposed that he shall act in the capacity of attorney. His obligation is to stand in the infant's place and determine what his rights are and what his interests and defense demand. Although not having the powers of a regular guardian, he fully represents the infant and is endowed with similar powers for purposes of the litigation in hand.... He is, therefore, both a fiduciary and lawyer of the infant, and in a special sense the representative of the court to protect the minor.

*Black v. Wiedeman,* 254 S.W.2d 344, 346 (Ky.1952) (*citing* Civil Code of Practice §§ 36 ["No judgment shall be rendered against an infant ... until the ... guardian ad litem ... shall have made defense."] and 38["A guardian ad litem must be a regular, practicing attorney of the court; ... It shall be [his] duty to attend properly to the preparation of the case; and in an ordinary action he may cause as many witnesses to be subpoenaed as he may think proper."]) [5] Almost simultaneously with *Black v. Wiedeman,* the Civil Code of Practice was superseded by the Civil Rules adopted effective July 1, 1953. The Civil Rules, however, continue to provide that, "in actions involving unmarried infants," where there is no guardian or the guardian is unable or unwilling to act, "the court ... shall appoint a guardian ad litem to defend.... No judgment shall· be rendered against an unmarried infant ... until the party's guardian or committee or the guardian ad litem shall have made defense or filed a report stating that after careful examination of the case he is unable to make a defense." CR 17.03(2)-(3). The presumption remains, furthermore, that the guardian *ad litem* shall be "a practicing attorney," CR 4.04(3), appointed to act in that capacity.

In conjunction with the adoption of the Civil Rules, moreover, the General Assembly transferred to the statutes certain sections of the Civil Code, including § 38 providing for the appointment, qualifications, duties, and reimbursement of guardians *ad litem.* Kentucky Acts, 1952, ch. 84. Accordingly, KRS 387.305 provides, in the same terms as § 38 did formerly, that a guardian *ad litem* may be appointed to defend an infant who does not have a resident guardian, curator, or conservator; that the guardian *ad litem* must be a regular, practicing attorney of the court; that his duty is to attend properly to the preparation of the case; and that he is to be allowed a reasonable fee for his services

5. We are grateful to the state's very able law librarian, Jennifer Frazier, and her staff for simplifying our access to these relevant historic materials.

"to be paid by the plaintiff and taxed in the costs." KRS 387.305(4). While it may be that purely procedural aspects of the statute would yield to inconsistent provisions in the Civil Rules, *Stanfield v. Willoughby*, 269 S.W.2d 270 (Ky.1954) (discussing the transition from the Civil Code to the Civil Rules and the priority of the Rules vis-a-vis KRS 387.305), the Rules and the statute do not seem to be at odds to the extent that both indicate an intent to carry forward the basics, at least, of the old Civil Code GAL practice. Adjusting for the rule and statutory shifts, in other words, *Black v. Wiedeman* seems to us still to provide, with one possible qualification, an accurate summary of the proper role of a Kentucky GAL.

The possible qualification pertains to the GAL's duties, which the *Wiedeman* Court said were "to stand in the infant's place and determine what his rights are and what his interests and defense demand." 254 S.W.2d at 346. In 1996, the General Assembly added to KRS 387.305 the following provision:

> Whether appointed pursuant to this statute or pursuant to a provision of the Kentucky Unified Juvenile Code, the duties of a guardian ad litem shall be to advocate for the client's best interest in the proceeding through which the guardian ad litem was appointed. Without an appointment, the guardian ad litem shall have no obligation to initiate action or to defend the client in other proceedings.

KRS 387.305(5). To the extent that *Wiedeman* could be thought to focus the GAL's representation on the child's preferences, as opposed to his or her "best interest," the new provision supersedes it. This emphasis on the child's "best interest" is significant, as is the new provision's reference to the Juvenile Code. To understand why requires a brief foray into federal law, which, although directly pertinent only to juvenile delinquency, dependency, and termination proceedings, has nevertheless had an impact on private custody disputes such as the one before us.

Very briefly, in 1967 the United States Supreme Court held, in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), that juveniles facing delinquency proceedings and the possibility of confinement in state institutions are entitled under the federal constitution to such due process basics as advance notice of the charges against them and a meaningful opportunity to be heard. They are also entitled, the Court held, to the assistance of counsel. 387 U.S. at 36–7, 87 S.Ct. 1428. The Court acknowledged the concerns of those who promoted the Juvenile Court movement—a movement much akin to the Family Court movement currently underway—that the strict formality' and adversarial nature of adult criminal proceedings could be unduly harsh and stigmatizing when applied to children. But the movement's aims were undermined, the Court explained, if the absence of formality from Juvenile Court proceedings left the impression, as it often did, not of therapeutic benevolence, but of mere expediency and unfairness. In compliance with *Gault*, KRS 610.060 provides that juveniles accused of crimes must be apprised by the court of their right to counsel, and that, absent waiver, counsel must be provided to juveniles whose families cannot afford it.

Criminal matters were not the only Juvenile Court proceedings to attract scrutiny. Critics also raised concerns that informal proceedings and unfettered judicial discretion created the potential for the abuse of individual rights in dependency proceedings as well. Federle, 36 U. Dayton L.Rev. at 347. In 1974, Congress enacted the Child Abuse Prevention and Treatment Act (CAPTA). 42 U.S.C. §§ 5101–

5107. By conditioning federal funding on state compliance with the Act's provisions, Congress sought with CAPTA to encourage states to reform their systems for discovering, investigating, preventing, and treating child abuse and neglect. Among CAPTA's provisions was a requirement that "in every case involving an abused or neglected child which results in a judicial proceeding a guardian ad litem shall be appointed to represent the child in such proceedings." 42 U.S.C. § 5103(b)(2)(G) (1976 & Supp. V 1981). Congress did not define "guardian ad litem," but in 1996, as part of the Adoption and Safe Families Act, and again in 2003, Congress amended the statute so as now to require complying states to submit a plan that will

> contain a description of the activities that the State will carry out using amounts received under the grant to achieve the objectives of this subchapter, including—. . .
>
> (B)(xiii) provisions and procedures requiring that in every case involving a victim of child abuse or neglect which results in a judicial proceeding, a guardian ad litem, who has received training appropriate to the role, including training in early childhood, child, and adolescent development, and who may be an attorney or a court appointed special advocate who has received training appropriate to that role (or both), shall be appointed to represent the child in such proceedings-

> (I) to obtain first-hand, a clear understanding of the situation and needs of the child, and
>
> (II) to make recommendations to the court concerning the best interests of the child.

42 U.S.C. 5106a(b)(2).

Our General Assembly has opted to participate in CAPTA and, while CAPTA does not require the child's representative to be an attorney, the General Assembly, clearly intending to assure compliance, has provided that in dependency, abuse, or neglect actions (so-called DNA proceedings) brought against a parent or other custodian

> [t]he court shall appoint counsel for the child to be paid by the Finance and Administration Cabinet. Counsel shall document participation in training on the role of counsel that includes training in early childhood, child, and adolescent development . . . The fee to be fixed by the court shall not exceed five hundred dollars ($500); however, if the action has final disposition in the District Court, the fee shall not exceed two hundred fifty dollars ($250).

KRS 620.100(1)(a)[6]

Congress's use of the term "guardian ad litem" gave it salience, of course, and contributed to the concerns noted above about its vague meaning. In Kentucky, those concerns were in part manifested by a performance audit issued in 1998 by the

---

**6.** This statute does not refer to the attorney appointed to represent the child as a guardian *ad litem*. In termination actions, however, both voluntary, KRS 625.041, and involuntary, KRS 625.080, a "guardian ad litem" must be appointed "to represent the best interests of the child." The GAL's fee is likewise limited to $500 and is paid, if the Cabinet of Health and Family Services is the proposed custodian, by the Finance and Administration Cabinet. The different terminology does not appear to reflect a substantive distinction, and indeed CR 17.03(5), addressing GAL reimbursement, expressly provides that "fees allowed to counsel for children . . . in dependency, abuse or neglect cases . . . shall not exceed the amounts specified in KRS 620.100." In any event, it is clear that in practice the attorney appointed to represent the child in a DNA action, or, as in this case, in a domestic custody proceeding, is commonly thought of and referred to as a "guardian ad litem."

Auditor of Public Accounts concerning GAL practice in DNA cases. The audit included a number of recommendations addressed to the judicial branch and thus prompted then-Chief Justice Lambert to organize a twenty-four-member Commission on Guardians *ad litem* (the GAL Commission) to address whether any of the Auditor's recommendations should be implemented. The GAL Commission was chaired by former Justice Cooper, and for five months, beginning in May 1999, heard testimony from numerous groups and individuals with interests in the matter, considered approaches taken by other states, and evaluated a Laurel–Knox County pilot GAL training program. The Commission's Report, issued in October 1999, recommended that GAL responsibilities be specified by statute and by rule, and that they include "advocat[ing] the child's best interest, but advis[ing] the court when the child disagrees with the attorney's assessment of the case." Admin. Office of the Courts, Recommendations of the Commission on Guardians *ad litem*, p. 4 (October 25, 1999). The Report also recommended mandatory GAL training to be organized by the Kentucky Bar Association. It emphasized, however, that without more liberal reimbursement attorneys were not apt to support or to submit to extensive training requirements. The Report's principal recommendation, therefore, was an increase in GAL funding.

As is sometimes the case with study commissions, the GAL Commission's recommendations bore little fruit. In particular, although some provision has been made for GAL training, GAL responsibilities remain unspecified and unclear, and the fees allowed to GALs in termination and DNA proceedings remain the same as they were fifteen years ago. The Commission's Report does, however, seem to have contributed (however unintentionally) to the notion that even in domestic, *i.e.*, KRS Chapter 403, custody disputes, the appointment of a GAL for the child (or children) is an option available to the court, and an option apt to cost the parties nothing (if the Department of Finance and Administration pays the fee)[7] or to at least cost less, because of the presumed $500 cap, than other types of custody evaluation, such as those performed by psychologists or social workers. The FCRPP, as noted, have acknowledged this practice to the extent of expressly including GAL appointment among Rule 6's other aids to domestic custody and visitation determinations.

## III. The Guardian Ad Litem Serves as an Attorney For the Child.

What the GAL Commission, with its broad mandate and relatively extensive resources, could not achieve, we clearly cannot accomplish in a single Opinion. Not before us in this case is any question about how Rule 6's GAL provision may relate to the General Assembly's rejection of section 310 of the Uniform Marriage and Divorce Act, any question about GAL practice in parental rights termination or DNA cases, or any question about GAL reimbursement. We do not address the entirety of GAL practice in family matters but take as our starting point the issue presented in a domestic custody dispute in which the trial court has appointed a GAL to represent the child, more specifically the proper role of the GAL.

### A. The Guardian Ad Litem Must be Distinguished From Investigators Appointed to Assist the Trial Court.

---

**7.** The Children's Law Center in Covington was appointed to represent the child in this case. Neither the Order appointing the Law Center nor the Final Order gives any indication that the parties were to pay its fee.

■ Courts, practitioners, and scholars addressing the GAL question have found two distinctions especially problematic. The first is the distinction between representatives appointed as counsel for the child and those appointed as agents of the court. The second, applicable where the representative is to serve as counsel, is the distinction between counsel who undertakes to represent the child's "best interest" and counsel who advocates for the child's wishes or "expressed interest." Donald N. Duquette, Julian Darwall, *Child Representation in America: Progress Report From the National Quality Improvement Center*, 46 Fam. L.Q. 87 (2012) (tracing the course of the debate over the suitability of these different roles); Marcia M. Bournil, Cristina F. Freitas, Debbie F. Freitas, *Legal and Ethical Issues Confronting Guardian Ad Litem Practice*, 13 J.L. 85 Fam. Stud. 43 (2011) (surveying approaches to child representation taken by different states) (*Legal and Ethical Issues*). The first is a distinction between, on the one hand, a child's representative appointed as an officer of the court to investigate the child's and the parents' situations, to file a report summarizing his or her findings, and to make recommendations as to the outcome of the proceeding—in Kentucky statutory terminology a sort of "friend of the court" (FOC); and on the other hand, a child's representative appointed to participate actively as legal counsel for the child, to make opening and closing statements, to call and to cross-examine witnesses, to make evidentiary objections and other motions, and to further the child's interest in expeditious, non-acrimonious proceedings—in our terminology a GAL. The problem is that, however referred to, the appointee is often expected to blur these roles—to investigate for the court and to litigate for the child. In this case, for example, the "GAL" was appointed expressly "to help the court decide the case," and in that role he examined records, interviewed the family members, and filed a report with concluding recommendations, a report that was introduced into evidence and was expressly considered by the trial court. The GAL also, however, participated as A.G.'s attorney at the hearing by examining the witnesses and making evidentiary objections.

As many courts and commentators have noted, *see, e.g., Legal and Ethical Issues, supra; Clark v. Alexander*, 953 P.2d 145 (Wyo.1998) (both collecting sources), this sort of hybrid GAL/FOC raises ethical dilemmas for the appointee—potentially conflicting duties of loyalty and confidentiality for example. It also, as Morgan argues, creates a conflict between, on the one hand, a party's due process right to confront the evidence against him or her—an adverse GAL's factual report and recommendations—and on the other hand, counsel's duty under SCR 3.130–3.7 not to act as advocate at a proceeding in which he or she is likely to be a necessary witness. It was this ethics rule the trial court apparently had in mind when it disallowed Morgan's cross-examination of the GAL. Although we sympathize with the trial court's dilemma, we agree with the many courts that have held that in these circumstances the party's constitutional due process right trumps the rule.

Applying the Supreme Court's *Mathews v. Eldridge* analysis,[8] clearly Morgan has a

---

8. In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court held that "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural

protected liberty interest in the care and custody of her daughter. *See Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("The liberty interest . . . of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."). Just as clearly, that interest was adversely affected by the custody proceedings in this case: as a result of the proceedings Morgan's daily contact with and care of A.G. was significantly altered—virtually terminated—by A.G.'s relocation to her father's home several hundred miles away.

By disallowing cross-examination of the GAL, furthermore, the trial court created a real and substantial risk that Morgan's fundamental interests would be erroneously impaired. The GAL's findings and recommendations were almost all adverse to Morgan. Without the vital tool of cross-examination, Morgan's ability to challenge the GAL's report was severely limited. We have recognized, even in civil cases, the fundamental importance of cross-examination, an aspect of the right to be heard. *Baker v. Kammerer,* 187 S.W.3d 292, 295 (Ky.2006). While it may be, as the trial court noted, that Morgan could test the accuracy of the GAL's report by questioning the people the report referred to, without the opportunity to cross-examine the GAL himself, Morgan had no means of probing his assumptions and potential biases, a probing that could well have affected the trial court's assessment of his recommendations.

With respect to the third *Mathews* factor, certainly the *GAL* had an interest in not being called upon to testify at a pro-

ceeding wherein he was serving as an advocate (even though he had also injected himself as a witness by filing his report), but the *state's* interest in disallowing his testimony, whether fiscal, administrative, or otherwise, appears to be nil. We conclude, therefore, that in domestic custody proceedings, the parties' right to due process includes the right to cross-examine the authors, including so-called GALs, of evidentiary reports upon which the fact finder is entitled to rely. Not only is this result consistent with the holdings of other courts confronted by the issue, *see, e.g., Barros v. Barros,* 309 Conn. 499, 72 A.3d 367 (013); *Puccinelli v. Puccinelli,* 364 Mont. 235, 272 P.3d 117 (2012); *Kelley v. Kelley,* 175 P.3d 400 (Okla.2007); *In re Marriage of Bates,* 212 Ill.2d 489, 289 Ill. Dec. 218, 819 N.E.2d 714 (2004); *Ross v. Gadwah,* 131 N.H. 391, 554 A.2d 1284 (1988), but it comports with KRS 403.090, KRS 403.290, and KRS 403.300 as well. Those statutes, while authorizing a custody-determining court to *sua sponte* request custodial investigations and other advice, all require that the parties be made aware of the court's inquiries and be allowed to cross-examine the court's sources of information. The parties' right to due process requires no less.

Our conclusion that the trial court erred by accepting into evidence the GAL's report but then denying Morgan's request to cross-examine the GAL does not end our analysis. The question then becomes, "What is the court to do?" On the one hand, as the General Assembly has long recognized, there may be custody cases, particularly highly contested cases or

---

safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. 893. This Court has previously applied the *Math-*

*ews* analysis. *See, e.g., Commonwealth v. Raines,* 847 S.W.2d 724 (Ky.1993) (*citing Div. of Driver Licensing v. Bergmann,* 740 S.W.2d 948 (Ky.1987)), *overruled on other grounds* in *Commonwealth v. Howard,* 969 S.W.2d 700 (Ky.1998).

cases with elements of dependency, neglect, or abuse, in which the facts relevant to the children's best interest are apt not to be as adequately or as objectively developed by the parties as the court would wish. In such cases, the court will naturally want the advice of someone like a "friend of the court," someone authorized to investigate independently the custodial situation and to report to the court about where things stand with the family. The children involved in such cases, moreover, might also seem in need of an independent advocate, a GAL, an unbiased adult who can explain the process to the children, convey to the court the children's wishes, make motions on the children's behalf, introduce evidence as need be to reflect the children's interest, and in general see to it that the proceedings move expeditiously and as non-acrimoniously as possible toward a just resolution.

On the other hand there is the stubborn fact of costs. Many parties in custody disputes are unable to bear the high costs of their own counsel, Steven K. Berenson, *The Elkins Legislation: Will California Change Family Law Again?*, 15 Chap. L.Rev. 443, 447 (2012) (noting "the virtual explosion in the number of litigants representing themselves in family court") (Berenson), so it is hardly surprising that family courts seeking to contain the parties' expenses have embraced the GAL as someone who, for a limited fee and possibly at state expense, serves both to advise the court and to represent the children. As noted, however, that hybrid role can easily result in a violation of the parties' rights. Accordingly a number of courts have required that the constituent roles of the "hybrid" GAL be separated. *See, e.g., Ross v. Gadwah, supra; Jacobsen v. Thomas,* 323 Mont. 183, 100 P.3d 106 (2004); *Clark v. Alexander, supra; Newman v. Newman,* 235 Conn. 82, 663 A.2d 980 (1995). An extensive academic literature has also come to a broad consensus that

> lawyers should act like lawyers in custody proceedings.... [They] should be limited to presenting information to the court in the manner that lawyers have traditionally presented information to the court—through admissible evidence and proper legal argument.... [They] should be prohibited from offering personal opinions regarding the outcome of custody proceedings, from testifying as witnesses in custody proceedings, and [from] offering reports to the court ... containing hearsay and other inadmissible evidence.

Berenson at 480 (discussing the trend of academic debate over the last twenty or so years).

We agree that an attorney should not be asked to serve simultaneously as both a *de facto* FOC investigator on the court's behalf and a GAL attorney for the children involved. Expediency and informality may argue for such a hybrid approach, but as this case illustrates the hybrid approach compromises basic notions of due process and is not consistent with the provisions the General Assembly has made for investigation in child custody matters. The court, rather, may choose. Under KRS 403.300 and FCRPP 6(2)(f), the court is authorized to enlist an attorney or other professional to "investigat[e] and report concerning custodial arrangements for the child." KRS 403.300(1). Unlike a GAL, this investigator serves as the court's agent, not the child's, and his or her role may include custodial recommendations. The investigator's file must be made available to the parties, and the investigator himself or herself must be available for cross-examination. KRS 403.300(3). If the court's concern is primarily to insure that it has been thoroughly and objectively apprised of the custodial circumstances,

this *de facto* FOC approach is generally apt to suffice, and it appears to be the approach the General Assembly intended as the trial court's principal recourse.

In addition to that approach, however, FCRPP 6(2)(e) provides for the appointment of a GAL. Like the FOC investigator, the GAL should undertake a thorough examination of the custodial circumstances, but *unlike* the investigator the GAL is the child's agent and is responsible, as is counsel for the parties, for making motions, for introducing evidence, and for advancing evidence-based arguments on the child's behalf. The GAL should *not* file reports, testify, make recommendations, or otherwise put his own or her own credibility at issue.[9] If the case is one involving highly conflicted parties; if it raises substantial dependency, neglect, or abuse concerns; if it involves a child with special needs; or if it involves an older child with decided and considered preferences, the appointment of a GAL may be particularly appropriate. Under FCRPP 6(2)(e), the appointment of a GAL is not limited to those circumstances, however, and the rule does not preclude (although expense certainly might) the appointment of both a *de facto* FOC investigator and a GAL, the need for which may become apparent only after some initial investigation. On the other hand, the rule does not require the appointment of either an investigator or a GAL (or any other of the authorized advisors), and the appointment of either does not require the appointment of the other. The court's task is the always delicate one of determining the child's best interest while at the same time ensuring fundamentally fair proceedings for the party-parents (or other custodians). Within that

latter constraint, the court's discretion to inform itself regarding the child's best interest is broadband for that purpose the appointment of a GAL alone may well suffice.

## B. The Guardian Ad Litem Represents the Child's Best Interest, Not Necessarily the Child's Wishes.

If the custody-and/or-visitation-determining court's options include, as under the FCRPP they do, the appointment of a GAL for the affected child, then it becomes necessary to consider the nature of the representation the GAL is to provide. Under the older hybrid FOC/GAL approach, it was generally presumed that the child's appointed representative was to seek to determine and to advocate for the child's best interest. In other words, the attorney was not constrained by the child's stated preferences, but was to assess the child's circumstances independently and if, in the attorney's judgment, the child's wishes did not serve the child's long-term interests, he or she was free to advocate for an outcome that did. As the old hybrid approach came under increasingly critical scrutiny, so too did this "best interest" sort of advocacy.

Critics maintain that "best interest" representation does not comport with the rules of professional responsibility, is outside the competence of most lawyers, and underestimates the right and the need of children to have their views represented in proceedings that will substantially affect their interests. Barbara Ann Atwood, *The Uniform Representation of Children in Abuse, Neglect, and Custody Proceedings Act: Bridging the Divide Between Prag-*

---

9. In *Clark v. Alexander*, 953 P.2d at 154, the Supreme Court of Wyoming observed that the parties could agree, in effect, to waive objection to an attorney GAL's submission of a report and custody recommendation and in

that way retain much of the convenience of the hybrid approach. That question is not before us, but we would caution against waivers potentially subject to the trial court's disapproval or the parties' second thoughts.

*matism and Idealism,* 42 Fam. L.Q. 63, 92–100 (2008) (summarizing and addressing the various criticisms) (Atwood, 2008). The alternatives the critics advance, often referred to as "expressed interest," "child centered," or "client directed" representation, would all require the attorney as much as possible to treat the child as just another client and to advocate as zealously for the child's favored outcome as he or she would for an adult client's. *Id.*

Children, of course, may be unable or unwilling to consider and articulate their preferences, and the critics differ as to the role of the attorney in those circumstances. The American Academy of Matrimonial Lawyers, for example, has published proposed standards for attorneys representing children in custody or visitation cases, and under its proposal, if the child is unable or unwilling to direct counsel then counsel simply should not be appointed. *American Academy of Matrimonial Lawyers Representing Children: Standards for Attorneys for Children in Custody of Visitation Proceedings With Commentary,* 22 J. Am. Acad. Matrim. Law 227 (2009). Other practitioner organizations have published proposed standards for the representation of children in custody cases likewise favoring a "client directed" relationship, but allowing for some degree of "substituted judgment" when the child cannot or will not articulate a meaningful preference. Atwood, 2008 (discussing the American Bar Association's, Standards of Practice for Lawyers Representing Children in Custody Cases (2003) and the American Bar Association's (via its National Association of Counsel for Children), Standards of Practice for Lawyers Who Represent Children in Abuse and Neglect Cases (1996)). Indeed, the ABA's Standards for Custody Cases allow for both types of attorney, a child-directed one and a "best interest" attorney. The latter is not bound by the child's wishes,

but instead, having carefully and thoroughly gathered the facts of the child's circumstances, including what the child wants, applies objective legal standards (relevant statutes and cases) to those facts to arrive at and then advocate for a disposition that would serve the child's best interest. Linda D. Elrod, 37 Fam. L.Q. at 121–22. As distasteful as this provision has proved to be to many scholars and some practitioners, it reflects legislative reality: "Although child advocates have been recommending stronger client directed roles for lawyers for more than two decades, state legislatures have not moved consistently in that direction." Atwood, 2008, at 91; *see also* Barbara Ann Atwood, *Representing Children Who Can't or Won't Direct Counsel: Best Interest Lawyering or No Lawyer At All?,* 53 Ariz. L.Rev. 381, 391 (2011) (collecting state statutes and cases retaining the "best interest" approach) (Atwood, 2011). As noted above, both Congress and the General Assembly have mandated "best interest" representation of children in DNA and parental rights termination cases, and the General Assembly, through KRS 387.305(5), has provided that GALs appointed pursuant to that statute are to "advocate for the client's best interest in the proceeding." Even if we were inclined to depart from that practice, therefore, in those cases at least we would not be at liberty to do so.

 In any event, we are not inclined to depart from the child's best interest approach in either those DNA and parental rights termination cases or in domestic custody cases such as this one. While the scholarly critics have certainly raised some valid concerns, the proposed upshot of those concerns—that in virtually all custody cases the children are essentially to be made parties with at least one and often two representatives (one to advocate for

the child's wishes and one the child's best interest), Martin Guggenheim, *A Law Guardian By Any Other Name: A Critique of the Report of the Matrimonial Commission*, 27 Pace L.Rev. 785 (2007)—is, in our view, however worthy of consideration in theory, unwieldy and impractical in practice.

It has been urged that "best interest" representation does not comport with the lawyer's obligations under the rules of professional responsibility. Atwood, 2008 (summarizing this and the following criticisms and providing citations). Certainly, a lawyer undertaking to serve in the hybrid role of attorney-for-the-child/advisor-to-the-court is immediately confronted with a likely conflict between his or her duty to report to the court and the duties to maintain the child-client's confidences, Supreme Court Rule (SCR) 3.130–1.6, and not to act as both advocate and witness. SCR 3.130–3.7. Even absent the likely conflicting responsibility as agent of the court, moreover, critics maintain that a "best interest" lawyer who substitutes his or her best-interest judgment for that of the child runs afoul of the duties to "advocate ... zealously ... the client's position," SCR 3.130, Preamble, and to "abide by a client's decisions concerning the objectives of representation." SCR 3.130–1.2.

Those rules are qualified, however, by SCR 3.130–1.14, which expressly recognizes that persons with diminished decision-making capacity, including minors, are not thereby precluded from having legal representation, but are entitled to representation that does not blindly disregard the limitations on their ability to look after themselves. To be sure, the rule requires that the lawyer shall, *"as far as reasonably possible,* maintain a normal client-lawyer relationship with the client," SCR 3.130–1.14(a) (emphasis supplied). But where the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial harm unless action is taken, and cannot adequately act in his or her own interest, "the lawyer may take reasonably necessary protective action." SCR 3.130–1.14(b). Such action can include, "in appropriate cases," seeking the appointment of a guardian *ad litem,* but as the commentary to the rule explains, "in many circumstances, ... appointment of a legal representative may be more expensive or traumatic for the client than circumstances in fact require. Evaluation of such circumstances is a matter entrusted to the professional judgment of the lawyer." SCR 3.130–1.14 comment [7]. A lawyer reasonably convinced that his or her child-client wants an outcome significantly at odds with the child's best long-term interests is authorized under this rule to "tak[e the] protective action" of advocating a position contrary to the child's wish and in accord with the child's best interest. To be sure, the commentary also notes that even young children ("as young as five or six years of age") can "hav[e] opinions that are entitled to weight in legal proceedings concerning their custody." SCR 3.130–1.14 comment [1]. But taking the child seriously does not entail standing by in the face of the child's immature and ill-informed judgment. The lawyer should explain to the child, if and to the extent possible, why he or she feels bound not to pursue what the child wants and should, if the child wishes, advise the court that the child disagrees with the attorney's assessment of the case. The rules do not preclude, however, an attorney's reasonable, good faith advocacy in a custody proceeding on behalf of the child's best interest, even if the child disagrees with the advocate.

Of course, just because a "best interest" representation does not *per se* contravene the rules of professional conduct does not make that representation proper. Critics

also maintain that legal training simply does not qualify lawyers to make "best interest" judgments for other people, in particular for people whose backgrounds, experience, and prospects are far different from the lawyer's own. This is a legitimate concern as doubtless there are children who have been disserved by overworked, unprepared attorneys advocating for custodial arrangements not on the basis of a particularized assessment of the child's needs and interests but rather on the basis of the attorney's own preconceptions of what childhood or family life should be. This particular concern is reflected in the federal and state law requirements that the GALs appointed in DNA cases have "training appropriate to the role, including training in early childhood, child, and adolescent development." 42 U.S.C. 5106a(b)(2); KRS 620,100(1)(a).

While the concern is legitimate, we are not persuaded that, as a rule, lawyers are so hampered by their own biases as to be incapable of a reasonably objective evaluation of their child-client's circumstances and interests, or that such a lawyer's disagreement with his or her client about what custodial arrangement would be best can only mean that the lawyer has misconceived those circumstances. The rules of professional conduct that permit the best-interest representation, after all, also require that that representation be competent, *i.e.*, that the lawyer provide "the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." SCR 3.130–1.1. The lawyer's discretion, furthermore, is constrained by the statutory best-interest factors (including the wishes of the child) that the court is obliged to consider and hence the lawyer is obliged to address, as well as by the particular facts of the case. Generally, a lawyer will understand better than other experts how legal standards will apply and what evidence will be relevant under those

standards, and thus will be well-situated to advocate a position incorporating both the child's wishes and interests. A properly trained GAL, in sum, who has thoroughly investigated the child's situation and consulted with the child, is not disqualified from advocating what he or she determines is the child's best interest merely because the child disagrees.

Finally, we note that in some states either the court appointing an attorney for a child or the attorney appointed has discretion to choose between a "best interest" or a "client directed" approach to the representation. Atwood, 2011. (citing statutes and discussing at length the discretion of appointing judges in Arizona). In this case, it appears that while the court appointed the GAL with the expectation that the GAL would represent A.G.'s best interest, the GAL understood his role rather as that of advocate for A.G.'s wishes. Conspicuously absent from the GAL's report, at any rate, is any reference to "best interests," and the report's discussion of the family circumstances does not appear to be an altogether objective appraisal, but rather one intended to support A.G.'s desire to relocate. Be that as it may, inasmuch as GALs are statutorily required to serve a "best interest" role in DNA and termination cases, and because, as this case may illustrate, there is a potential for misunderstanding if the attorney's role is allowed to vary, we believe the safer course is simply to require a "best interest" role for GALs appointed in custody cases as well as in DNA and termination cases. The role distinction would only make a difference in those few cases where the attorney and the child find themselves at cross purposes, and in those cases it seems to us especially important for the court both to hear the evidence that has persuaded the attorney and to be informed of the conflicting views of attorney and child.

Because in those cases the court is made aware of the child's contrary wishes, the child's interests will not be unduly impaired if the GALs' representation is limited to the "best interest" sort.

Another reason often advanced in opposition to this result—the insistence on "best interest" representation for child-clients—is the asserted tendency of "best interest" representation to suppress the voices of children and to disempower them in proceedings that will significantly affect their interests. "Child centered" or "client directed" representation, on the other hand, is seen as respecting and encouraging child autonomy as well as keeping the attorney appropriately focused on protecting his or her client's rights, the only role attorneys are deemed competent to play. Atwood, 2011 at n. 1 (collecting sources advancing this rationale for "client directed" representation). While this case does not require us to explore whether or to what extent children may have rights in a custody proceeding, we certainly agree with the critics that the child's wishes should be considered. Indeed, the law requires that a court making a custody determination "shall consider ... [t]he wishes of the child as to his custodian." KRS 403.270(2)(b). Consideration of the child's wishes is especially important where the GAL's best-interest determination has resulted in a conflict with the child. In that case, unless the child objects, the GAL should make the court aware of the conflict and briefly inform the court what disposition the child desires. The attorney should not, however, engage in fact-based explanations outside the facts to be proved at the hearing. Of course, the court may then wish to interview the child pursuant to KRS 403.290. This approach, to be sure, is a far cry from allowing the child to direct the representation, but in our view, even assuming that children have an autonomy interest that can

and should be advanced in custody proceedings, they also have an overriding interest in the court's protection that can only be served by allowing the GAL to make and to act upon an independent assessment of the child's "best interest."

### CONCLUSION

In sum, courts addressing custody and visitation disputes have broad rule and statutory authority to obtain the assistance of various professionals to help them understand the custodial situation and to make a determination as to the child or children's best interest. That authority includes the ability to appoint an attorney as a *de facto* friend of the court to investigate the circumstances on the court's behalf, to file a report summarizing his or her findings, and to make custodial recommendations. Unless otherwise provided by statute or rule, persons, including attorneys, engaged by the court in this manner to supply it with information must promptly be made known to the parties, their reports and their sources must be disclosed, and if duly summoned they must appear at the final hearing for cross-examination. Also unless otherwise provided, the fee or fees owing to such persons shall be determined by the court and charged to the parties as costs.

The FCRPP also provide for the appointment of a guardian *ad litem* for the child in custody, shared parenting, visitation, and support proceedings. Under our rules a guardian *ad litem* must be an attorney, and an attorney so appointed shall be understood as representing the child-client's best interest. Should the attorney's assessment of those interests conflict with the child's own wishes, the attorney should, unless the child rejects the suggestion, apprise the court of the conflict, and briefly indicate what the child desires and why the attorney has conclud-

ed otherwise. The Family Court Rules provide that guardian *ad litem* fees, like the fees of other court-appointed assistants, "may be apportioned at the expense of the parents or custodians." FCRPP 6(1).

Importantly, the guardian *ad litem* should not be confused with the *de facto* friend of the court. Whereas the friend of the court investigates, reports, and makes custodial recommendations on behalf of the court, and is subject to cross-examination, the guardian *ad litem* is a lawyer for the child, counseling the child and representing him or her in the course of proceedings by, among other things, engaging in discovery, in motion practice, and in presentation of the case at the final hearing. The guardian *ad litem* neither testifies (by filing a report or otherwise) nor is subject to cross-examination.

The trial court's comingling of two distinct roles in this case—having the GAL investigate and report as though he were an FOC, but shielding him as a GAL from cross-examination—was erroneous and infringed upon Morgan's right to due process. As noted above, the Court of Appeals stopped short of holding that the trial court erred, concluding that even if there was an error, it was harmless. The case having since been mooted by A.G.'s turning eighteen years old, we need not consider whether the error we have identified can be deemed harmless given the evidence of record. Instead, we simply vacate both the Opinion of the Court Appeals and the March 12, 2012 Final Order of the Campbell Circuit Court.

All sitting. All concur.