RENDERED: JULY 9, 2020
TO BE PUBLISHED
FINAL
DATE 7/31/20

# Supreme Court of Kentucky

2019-SC-000379-DG

MICHAEL GREENE                                          APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                          CASE NO. 2018-CA-000225
OLDHAM CIRCUIT COURT NO. 11-CI-00810

ELIZBETH BOYD (FORMERLY GREENE)                         APPELLEE

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

### AFFIRMING

A family court order denied the father's, Michael Greene's, motion to modify the parenting schedule for the two minor children of his former marriage to Elizabeth Boyd. In Greene's appeal of that order, the Court of Appeals found error in the family court's admission and reliance upon certain statements by the court-appointed Friend-of-Court investigator (FOC) but affirmed the family court's decision because the error was harmless.

We granted Greene's petition for discretionary review to consider the following two issues: (1) whether statements and information contained within investigative reports generated by court-appointed FOCs under Kentucky Revised Statute (KRS) 403.300 are admissible in domestic custody proceedings and (2) whether the FOC offered opinions in the present case concerning the parents' mental health that would otherwise require expert qualification.

We affirm the result reached by the Court of Appeals, but we hold that first and second-level hearsay statements contained within an FOC's investigative report that do not fall within a recognized hearsay exception are nonetheless admissible as evidence in a domestic custody proceeding where the notice and procedural requirements comply with KRS 403.300(3). We also hold that a family court's appointment of an FOC to investigate and generate a report under KRS 403.300 amounts to a determination that the FOC is sufficiently qualified to offer opinion evidence concerning the fitness of a parent and child's custody arrangements.

## I. BACKGROUND.

Greene and Boyd were married for twelve years. Their marriage produced two children, E.G. and A.G., who are minors. Since Greene and Boyd's divorce in 2012, the children have resided with Boyd in Kentucky. Greene currently resides in St. Louis, Missouri. Both Greene and Boyd have remarried. Boyd is currently the primary residential custodian, and Greene has parenting time on alternating weekends.

On January 30, 2015, Greene filed a motion for modification of the parenting schedule, requesting that he become the primary residential custodian of E.G. and A.G. The primary basis for Greene's request was his belief that Boyd's mental health interfered with her ability to remain primary residential custodian.

2

The family court originally interpreted Greene's motion as seeking a change in custody and summarily denied it without a hearing. The Court of Appeals reversed and directed on remand that the family court hold a hearing on whether Greene could establish that a modification of the timesharing to make him the primary residential parent was in the best interest of the children.

On remand, the family court appointed Briana Abbott, a licensed attorney in Kentucky, to serve as an FOC to investigate the custody circumstances of the parents and children and generate a report under KRS 403.300(2).[1] The family court also appointed Dr. David Feinberg, a psychologist, to perform an "issue focused assessment" on the parenting schedule.

The FOC filed her initial report on July 26, 2016, and the report was hand-delivered to Greene's and Boyd's attorneys on the same day. After several continuances, a bench trial was held almost a year later, on July 3 and 5, 2017. Because of the time lapse between the FOC's original report and the time the bench trial was held, the family court requested by order dated June 27, 2017, that the FOC provide an updated report. The FOC filed the updated report with the court on June 30, 2017, the Friday before the bench trial was scheduled to begin the following Monday.

---

[1] FOC investigators are generally paid by the parents or custodians pursuant to Family Court Rules of Procedure and Practice (FRCPP) 6(2).

In conducting her investigation, the FOC met with the following people: the parties and their spouses; the children; Boyd's health-care providers including Dr. Mohamed Khodeir, a psychiatrist, and Dr. Jacquelin Graven, a therapist; the children's therapist, Melanie Young; E.G.'s counselor at school, Maura Mason; A.G.'s counselor at school, Paula Moore; one of the children's teachers, Krista Hanke; the parties' attorneys; and Dr. Feinberg. The FOC also reviewed the following documents: email communications from the parties, their spouses, and their attorneys; the entire court file; a 2011 and 2013 psychologist report of E.G.; and medical records from Boyd's health-care providers.

In her report, the FOC opined that, based on her investigation, she believed Boyd functioned well as the primary residential custodian. The FOC's recommendation was the same in both the original and updated report: she recommended keeping primary residential custodian status with Boyd but granting more time for Greene during summer and vacation breaks.

During the bench trial, the family court heard testimony from the parties, the FOC, Tara Greene, and Melanie Young. The depositions of Dr. Michael Jenuwine (Boyd's expert), Krista Hanke, and Dr. Khodeir were submitted into evidence.

The state of Boyd's mental health is undisputed. She has a history of depression, was diagnosed with bipolar disorder, and has tried many forms of treatment and medication. In January 2016, Boyd checked herself into the Brook Hospital, a mental-health hospital, when she was having difficulty

4

coping with the stress of this litigation. After her discharge, Boyd continued treatment with Dr. Khodeir.

Much of the dispute centered around Boyd's ability to parent the children as their primary residential custodian. Dr. Kohdeir opined that Boyd's mental-health condition was stable and did not affect her ability to parent. Melanie Young likewise testified that Boyd's mental health seemed stable with respect to the children.

Dr. Feinberg, however, expressed concerns about Boyd's ability to parent given her hospitalization and history of stopping medications. He also opined that her years of mental-health treatment had produced little improvement. Dr. Feinberg's opinion was based on his review of mental-health records and the testimony of Boyd's treating physicians. He also met with Boyd for one hour.

The FOC testified to her observations and findings from her investigation and report. She testified that she believed Boyd functioned well as the primary residential custodian and the children generally seemed to be doing well with Boyd in Kentucky. She also relayed several statements and information from sources with whom she consulted during her investigation. Notably, the FOC relayed the opinion of Dr. Graven that Boyd's mental health was stable, that it did not affect her ability to parent, and that she was compliant with her treatment schedule.

In its findings of fact and order, the family court discussed extensively the testimony and report of the FOC and noted that the court often used Abbott as an FOC and found her "to be thorough, trustworthy, unbiased and

5

places great weight on her insights and recommendations." The family court relied on the FOC's opinion that "she had no concerns regarding [Boyd's] mental health at present time, that she is compliant with her medication and therapy, and that she has a good support system in place" and that the FOC "did not believe [Boyd's] mental health conditions had any effect upon the children."

The family court also noted that Melanie Young, Dr. Khodeir, and Dr. Graven all concurred that Boyd's mental health was not an impediment to her ability to remain the primary residential custodian. And the court discounted the opinion of Dr. Feinberg, noting that the court perceived inconsistencies with respect to Dr. Feinberg's overall treatment and consideration of the parties and that Dr. Feinberg spent only one hour with Boyd. For that reason, the family court stated that it was placing less weight on Dr. Feinberg's opinion than that of Boyd's treating physicians.

The family court ultimately agreed with the recommendation of the FOC, finding that it would be in the best interest of A.G. and E.G. to remain living with Boyd. The court denied Greene's request to make him the primary residential custodian but ordered additional parenting time for him during summer and vacation breaks.

Greene appealed to the Court of Appeals, which affirmed the family court's ruling. The appellate panel held that the family court erred in admitting and relying upon hearsay statements contained within the FOC report and testimony from the sources the FOC interviewed. The appellate panel also

6

found error in the family court's admitting and relying upon the FOC's own opinion concerning Boyd's mental-health condition and its effect on her children. But a majority of the appellate panel ultimately held those errors to be harmless, so the court affirmed the family court's decision.

## II. ANALYSIS.

"Custody disputes have long been recognized as not fitting neatly into our primarily adversarial system of dispute resolution."[2] In typical civil proceedings "the court relies and is expected to rely solely on the evidence presented by the parties."[3] But because of the danger that parties in a custody proceeding will not develop fully an accurate picture of the custody conditions of each home, our system allows by design a number of ways for a court to seek out information on its own.[4] One of those ways is through the appointment of "an officer of the court to investigate the child's and parents' situations, to file a report summarizing his or her findings, and to make recommendations as to the outcome of the proceeding—in Kentucky statutory terminology a sort of 'friend of the court[.]'"[5]

The statute authorizing the use of FOC investigators in custody proceedings, KRS 403.300, has been in place since 1972, when the General

---

[2] *Morgan v. Getter*, 441 S.W.3d 94, 103 (Ky. 2014) (citing Janet Weinstein, *And Never the Twain Shall Meet; The Best Interests of Children and the Adversary System.* 52 U. Miami L. Rev. 79 (1997)).

[3] *Id.* at 104.

[4] *See id.*

[5] *Id.* at 111.

Assembly adopted the Uniform Marriage and Divorce Act.[6] That statute provides that a court may order an investigation and report concerning the custodial arrangements for the child and that the investigator may interview a wide range of persons in conducting its investigation.[7] The statute also contemplates the report coming into evidence, provided that the parties are given sufficient notice and the right to call the investigator or any sources of information contained in the report for cross-examination.[8] The full text of the statute is as follows:

(1) In contested custody proceedings, and in other custody proceedings if a parent or the child's custodian so requests, the court may order an investigation and report concerning custodial arrangements for the child. The investigation and report may be made by the friend of the court or such other agency as the court may select.

(2) In preparing his report concerning a child, the investigator may consult any person who may have information about the child and his potential custodial arrangements. Upon order of the court, the investigator may refer the child to professional personnel for diagnosis. The investigator may consult with and obtain information from medical, psychiatric, or other expert persons who have served the child in the past without obtaining the consent of the parent or the child's custodian; but the child's consent must be obtained if he has reached the age of 16, unless the court finds that he lacks mental capacity to consent. If the requirements of subsection (3) are fulfilled, the investigator's report may be received in evidence at the hearing.

(3) The clerk shall mail the investigator's report to counsel and to any party not represented by counsel at least 10 days prior to the hearing. The investigator shall make available to counsel and to any party not represented by counsel the investigator's file of underlying data, and reports, complete texts of diagnostic reports made to the investigator pursuant to the provisions of subsection (2), and the names and

---

[6] *See id.* (referring to UNIF. MARRIAGE AND DIVORCE ACT § 401–10 (1974)).

[7] KRS 403.300(2).

[8] *Id.* at (2), (3).

addresses of all persons whom the investigator has consulted. Any party to the proceeding may call the investigator and any person whom he has consulted for cross-examination. A party may not waive his right of cross-examination prior to the hearing.[9]

In *Morgan v. Getter*,[10] we clarified the role of FOCs appointed under KRS 403.300 to assist the family court in contested custodial disputes. We addressed a common practice in family courts across the Commonwealth in conflating the roles of FOCs and guardians *ad litem*, and we made clear that the two roles were separate.[11] We also held that it was error for the family court to deny the parties the right to cross-examine the FOC when its report is admitted as evidence.[12]

We now confront two more issues related to FOC investigator reports in custody proceedings: (1) whether statements appearing in the FOC report that constitute hearsay are nevertheless admissible in custody proceedings, and (2) whether the FOC may offer certain opinions concerning the mental health of the parents that would otherwise require expert qualification to be admissible in trial proceedings. But we begin by noting a fundamental separation-of-powers issue that underlies our analysis.

---

[9] *Id.*

[10] 441 S.W.3d 94 (Ky. 2014).

[11] *Id.* at 113.

[12] *Id.* at 112.

9

## A. KRS 403.300 contemplates the FOC report being admitted into evidence, but that does not decide these issues.

Although not briefed by either party, we find it necessary to explain why KRS 403.300(2)'s direction that "the investigator's report may be received in evidence at the hearing" does not decide the issues in this case.

"Section 27 of the Constitution of Kentucky creates three distinct departments of government, and Section 28 precludes one department from exercising any power properly belonging to either of the others."[13] Section 116 gives to this Court the exclusive authority to prescribe "rules of practice and procedure for the Court of Justice."[14] With this principle in mind, in 1992 both the General Assembly and this Court adopted KRE[15] 1102, which provides that "the General Assembly . . . may not adopt amendments or additions to the Kentucky Rules of Evidence that constitute rules of practice and procedure under Section 116 of the Constitution of Kentucky."[16] And even before "the 1975 adoption of the Judicial Article, which included Section 116, the General Assembly had formally recognized the authority of the judiciary over matters of practice and procedure[.]"[17] So even at the time KRS 403.300 was enacted, this Court was the final arbiter of rules of "practice and procedure."

---

[13] *Manns v. Commonwealth*, 80 S.W.3d 439, 443 (Ky. 2002).

[14] Ky. Const. § 116.

[15] Kentucky Rule of Evidence.

[16] KRE 1102(b).

[17] *Manns*, 80 S.W.3d at 443. *See* 1962 Ky. Acts, ch. 234 (Preamble), which provides, in part, the following:

> It is therefore declared to be the policy of the General Assembly, insofar as the Legislative Department is empowered to express policy on matters

Statutes purporting to address what evidence is admissible or inadmissible generally amount to rules of practice and procedure[18] and therefore "invade the rule-making prerogative"[19] of the Court. As such, even if we construed KRS 403.300 as directing Kentucky family courts to receive the report into evidence, such a direction would likely be invalid.[20]

But even still, "it has not been the policy of this court to nullify as a matter of course all legislation which infringes to some extent upon a proper function of the judiciary."[21] Instead, we have often upheld the infringing mandate, particularly where it is not inconsistent with our rules, as a matter of comity.[22]

---

of judicial procedure, that prescription of rules governing details of procedure will be left to the discretion of the Judicial Department after the effective date of this Act.

[18] *See, e.g., O'Bryan v. Hedgespeth*, 892 S.W.2d 571, 573–76 (invalidating a statute as prescribing practice or procedure where it directed that "collateral source payments . . . shall be an admissible fact in any civil trial" because the "[r]esponsibility for deciding when evidence is relevant to an issue of fact which must be judicially determined . . . falls squarely within the parameters of 'practice and procedure' assigned to the judicial branch by the separation of powers doctrine and Section 116.").

[19] *Commonwealth v. Reneer*, 734 S.W.2d 794, 796 (Ky. 1987).

[20] We avoid construing this provision either way, in part because the separation-of-powers issue was not argued by the parties and in part because at least a colorable argument exists that the statute anticipates that the court still has authority to exclude the evidence, as expressed using the word "may." *See Caneyville Volunteer Fire Dept. v. Greene's Motorcycle Salvage, Inc.* 286 S.W.3d 790, 808 (Ky. 2009) ("[I]f there are two ways to reasonably construe a statute, one upholding the validity and the other rendering it unconstitutional, we 'must adopt the construction which sustains the constitutionality of the statute.'" (quoting *Flynt v. Commonwealth*, 105 S.W.3d 415, 423 (Ky. 2003)).

[21] *Commonwealth v. Reneer*, 734 S.W.2d 794,796 (Ky. 1987).

[22] *See, e.g., Glenn v. Commonwealth*, 436 S.W.3d 186, 188 (Ky. 2013) ("We conclude that, although KRS 29A.290(2)(b) 'constitutes an encroachment by the General Assembly upon the prerogatives of the Judiciary,' it is not inconsistent with

Concluding below that the admitting of statements contained within the FOC's report that would otherwise constitute hearsay is not inconsistent with our rules, we would nevertheless find no issue with KRS 403.300 even if challenged on separation-of-powers grounds. But the point is that the fact that the statute contemplates the report's being admitted into evidence does not decide the issues in this case.

## B. The family court did not err in modifying timesharing.

Having clarified that KRS 403.300's direction to admit the investigator's report into evidence does not decide this case, we now consider whether the family court erred in modifying the parties' timesharing schedule. KRS 403.320(3) applies to requests for modification of visitation and allows for modification "of an order granting or denying visitation rights whenever modification would serve the best interests of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral, or emotional health."

The court has broad discretion in modifying timesharing.[23] As such, "we will only reverse a circuit court's determinations as to visitation if they constitute a manifest abuse of discretion or were clearly erroneous in light of

---

our rules and is, therefore, upheld as a matter of comity." (citing *Reneer*, 734 S.W.2d at 797); *Reneer*, 734 S.W.3d at 797–98 (holding that truth in sentencing statute violated separation of powers doctrine but leaving it in place under principles of comity because it did not result in an "unreasonable interference with orderly procedure").

[23] *See Pennington v. Marcum*, 266 S.W.3d 759, 769 (Ky. 2008) ("Every case will present its own unique facts, and the change of custody motion or modification of visitation/timesharing must be decided in the sound discretion of the trial court.").

the facts and circumstances of the case."[24] The family court's findings are not clearly erroneous if supported by substantial evidence.[25]

### i. Out-of-court statements contained within the FOC's report.

Greene first argues that the family court erred in admitting and relying on certain testimony by the FOC because it amounted to inadmissible, second-level hearsay. Specifically, he argues that the family court erred in allowing the FOC to testify regarding out-of-court-statements made by the children, Boyd's therapist, the children's teachers, Boyd's spouse, and others during the FOC's investigation because none of those witnesses appeared at the hearing for cross-examination. Greene's counsel objected to the FOC's testimony during the bench trial, but the family court overruled the objection because the statements "were part of [the FOC's] investigation." It is undisputed that this issue is preserved for our review.

We note first that custody-investigation reports generated by FOCs will almost unavoidably include hearsay statements of the investigator's sources. As another court put it:

> [T]hese reports consist largely of hearsay declarations often double- or triple-level hearsay as well as opinions of various social workers, medical or paramedical personnel, psychologists, teachers and the like, which may or may not have a reasonable basis. Statements contained in a custody investigation report have no special indicia of reliability. They are generally not under oath and often emanate from people having overt or covert bias. In many instances, the

---

[24] *Layman v. Bohanon*, 599 S.W.3d 423, 431 (Ky. 2020) (quoting *Drury v. Drury*, 32 S.W.3d 521, 525 (Ky. App. 2000)) (internal quotation marks omitted).

[25] *D.G.R. v. Com., Cabinet for Health and Human Services*, 364 S.W.3d 106, 113 (Ky. 2012) (citing *K.R.L. v. P.A.C.*, 210 S.W.3d 183, 187 (Ky. App. 2006)).

statements represent subjective feelings and perceptions rather than objective observations or empiric data.[26]

The dangers of admitting such statements without proper due-process protection is apparent. Parents have a fundamental liberty interest in the care, custody, and management of their child.[27] And, pointing to due-process and fundamental fairness concerns, this Court has already held that it is error for a court to admit and consider an investigative custody report in domestic custody proceedings without first affording the parties an opportunity to read the report and challenge its author.[28]

For the same reasons, we think it would also be error to admit and consider statements contained within the FOC's report without giving the parties a meaningful opportunity to challenge the sources of those statements. And such an opportunity to cross-examine the sources of these statements is already available to parties in domestic custody proceedings under KRS 403.300(2). Recall that the statute purports to allow the investigator's report into evidence only if the report is made available to the parties at least 10 days before the hearing, the sources of statements and information are identified in

---

[26] *Denningham v. Denningham*, 431 A.2d 755, 759 (Md. Ct. App. 1981).

[27] See *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest . . . of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.")

[28] *Morgan*, 441 S.W.3d at 112 ("We conclude, therefore, that in domestic custody proceedings, the parties' right to due process includes the right to cross-examine the authors, including so-called GALs, of evidentiary reports upon which the fact finder is entitled to rely.").

the report, and the parties can cross-examine the sources up until the time the

hearing begins:

> The clerk shall mail the investigator's report to counsel and to any
> party not represented by counsel at least 10 days prior to the
> hearing. The investigator shall make available to counsel and to
> any party not represented by counsel the investigator's file of
> underlying data, and reports, complete texts of diagnostic reports
> made to the investigator pursuant to the provisions of subsection
> (2), and the names and addresses of all persons whom the
> investigator has consulted. Any party to the proceeding may call
> the investigator and any person whom he has consulted for cross-
> examination. A party may not waive his right of cross-examination
> prior to the hearing.[29]

We hold now that even where out-of-court statements appearing in the

FOC report do not fall within an existing hearsay exception—as Greene argues

the statements at issue in this case do not satisfy any hearsay exception—

adherence to the requirements of KRS 403.300(2) affords sufficient due-process

protection to allow the evidence to be admitted and relied upon by the court.

That is, statements contained within the FOC's report that would otherwise

amount to hearsay are admissible, so long as the parties are given sufficient

notice of the report and its sources and the opportunity to refute them as

contemplated by KRS 403.300(2).[30] The remedy is not to exclude the

---

[29] KRS 403.300(2).

[30] While Boyd called the FOC to testify at the bench trial and presumably moved to admit the reports in evidence, we note the possibility that judges may take it upon themselves to rely on the report even when it is not introduced in evidence by the parties. When this occurs, the requirements of KRS 403.300(2) still apply, but in addition we think it would be sound practice for the trial court to also give notice of its intention to rely on the report in advance of the hearing. A warning by the judge would avoid any assumption by the parties that the report would not be considered and prompt them to determine whether they should call the report's author or sources for cross-examination. See Custody of Two Minors, 476 N.E.2d 235 (Mass Ct. App. 1985) (issuing same cautionary guidance).

statements when they are identified as hearsay but instead to provide the parties with an opportunity to challenge their sources. This view is consistent with other courts that have considered this issue.[31]

We disagree with Greene's argument that certain information from the FOC's sources was inadmissible because "it was only supported by the FOC's recollection of her conversations with third parties." As explained above, those statements may be relayed to the court through the FOC's testimony and report, provided that each party has sufficient notice of the report and an opportunity to cross-examine the sources.[32]

---

[31] *See, e.g., Adoption of Luc,* 139 N.E.3d 337, 350 (Mass. 2020) ("Under what we will refer to as the Luc criteria, first- and second-level hearsay contained within DCF reports and official DCF records is admissible for statements of primary fact, so long as the hearsay source is specifically identified in the document and is available for cross-examination, should the party challenging the evidence request to do so. If the source is not already present in court, the party challenging the evidence may subpoena him or her. And once again, the hearsay need not meet the Luc criteria if it satisfies another, preexisting hearsay exception."); *see also Care and Protection of Leo,* 646 N.E.2d 1086, 1090 (Mass. Ct. App. 1995) ("[T]fact that statements also appear in an investigator's report does not ipso facto render them admissible for their truth. For such admissibility, what is required is that there be []an opportunity to []refute the investigator and the investigator's sources through cross-examination and other means. . . . The opportunity to refute the report and to cross-examine the investigator and his sources is sufficient to protect the father's rights."); *Custody of Michel,* 549 N.E.2d 440, 443 (Mass. Ct. App. 1990) ("The remedy is not to attempt to purge secondary hearsay from [custody] reports but to afford an opportunity to refute the investigator and the investigator's sources through cross-examination and other means.").

[32] Greene cites in passing two cases from the Court of Appeals for the proposition that allowing hearsay statements into evidence may amount to error in custody proceedings. *See V.S. vs. Com. Cabinet for Health and Family Sves.,* 706 S.W.2d 420 (Ky. App. 1986) (finding error, though harmless, where a family court in termination of parental rights proceeding admitted second-level hearsay statements contained in the Cabinet for Human Resource's case file because it amounted to the "unrestricted infusion of materials not otherwise admissible under our rules of evidence" (citing *G.E.Y. v. Cabinet for Human Resources,* 702 S.W.2d 713 (Ky. App. 1985)); *See also Baldwin v. Mollette,* 27 S.W.3d 830 (Ky. App. 2017) (finding family court in a child custody proceeding erred in admitting and relying upon hearsay statements contained in the testimony of the children's uncle who attempted to act as

Turning to the facts of this case, we find that Greene *did* have sufficient notice and an opportunity to cross-examine the FOC's sources. The family court on April 15, 2016, appointed an FOC to investigate and generate a report concerning the custodial circumstances of the child.[33] The FOC filed her report with the court on July 26, 2016, and the report was hand-delivered to Greene's and Boyd's attorneys on the same day. But because the bench trial was ultimately continued for almost a year—until July 3, 2017—the family court ordered on June 27, 2017, an updated report from the FOC, detailing any new information she gleaned since her first report and updating her recommendation accordingly. The updated report was filed and delivered to counsel on Friday, June 30, 2017, allowing only the weekend before the bench trial began on Monday, July 3, 2017.

Although this updated report was not filed at least 10 days before the bench trial as required by KRS 403.300(3), the family court appears to have left the record open after the early-July bench trial. Notably, the family court allowed the testimony of Dr. Jenuwine and Krista Hanke to be taken by deposition and submitted into the record *after* the bench trial ended because

---

an "attorney-in-fact" for the father). We do not question that position, but we note our holding now that statements contained in FOC reports carry a sufficient degree of reliability to allow their use in custody proceedings *where the parties are given a meaningful opportunity to challenge the sources of those statements*. Specifically, such an opportunity exists where KRS 403.300 has been complied with, and so the statements are admissible in such a case even where a recognized hearsay exception does not apply.

[33] Greene originally moved for the appointment of an FOC to assist the court on April 8, 2016.

those witnesses were unavailable to testify at that time. In fact, Greene asked for and was permitted to have Dr. Feinberg submit an affidavit responding to Dr. Jenuwine's criticism of his report well after the July bench trial. So presumably Greene could have requested the similar opportunity to cross-examine the sources mentioned in the updated FOC report during and even after the bench trial, and we suspect that trial court would have granted that request. But we find no instance in the record where Greene made such a request, nor has he directed us to any.

While we stress that KRS 403.300 requires the FOC report to be submitted *at least* 10 days before the hearing on the custody determination, we recognize that in some cases that may not be feasible. In those cases, the family court should allow ample opportunity for the parties to challenge the sources of the FOC even after the hearing is held, as we suspect the family court in this case would have allowed. And given the significant due-process concerns involved, in all cases the family court should strive to allow the parties reasonable time to exercise the ability to challenge the report's sources.

But even assuming Greene was not given the opportunity to cross-examine the sources of the updated report, we believe the family court's admission into evidence and reliance upon that report does not require reversal. We review the family court's findings for clear error, and we will not set them aside if supported by substantial evidence.[34] In this case, we find that

---

[34] *Layman v. Bohanon,* 599 S.W.3d 423, 431 (Ky. 2020) Citing *Drury v. Drury,* 32 S.W. 3d 521,525 (Ky. App. 2000)).

more than enough evidence existed in the record to support the family court's conclusion that Boyd's mental health did not affect her ability to parent and that it was in the children's best interest for her to remain the primary residential custodian.

Aside from any information contained in the updated FOC report, the family court heard from multiple sources that Boyd's mental health did not negatively affect her ability to parent. Dr. Khodeir, Boyd's treating physician, testified that Boyd's mental health did not affect her ability to parent and that he did not have any concerns about her ability to care for her children. Melanie Young, the children's therapist, also testified that she found Boyd to be meeting her children's needs and that she further believed Boyd's mental health was stable with respect to her children. In fact, only Dr. Feinberg's testimony reflected negatively on Boyd's mental health, and the court properly discounted his opinion because his contact with Boyd was relatively minimal and because the court perceived inconsistencies in his treatment and consideration of the parties.

The court also considered testimony from multiple witnesses that the children are generally happy with Boyd and their home life in Kentucky. Melanie Young testified that she believed the children had more of a support system in Kentucky than they did in Missouri and that they both considered Boyd's home to be their home.[35] She also testified that the children had

---

[35] Greene suggests that Young's testimony was not supportive of the family court's determination and notes that Young "stated that E.G. felt [Greene's] home was more stable, and that A.G. behaved better whenever [Greene] took her to an

19

primarily bonded with Boyd. The family court noted that Greene acknowledged that the children were happy and seemed to be doing well with school, friends, and extracurricular activities. While the court heard testimony from Greene that the children had been emotionally affected in a negative way by Boyd's mental health, it noted that Greene could not offer specific examples.

Greene primarily complains of the family court's reliance on statements made by Dr. Graven, Boyd's psychologist, that were relayed to the court through the FOC's report and testimony. We find the testimony of Dr. Khodeir and Melanie Young sufficient to support the court's finding that Boyd's mental health did not negatively affect her ability to parent. But we note additionally that the FOC's original report included the fact that Dr. Graven believed Boyd was stable and compliant with her treatment recommendations. While the court also relied on Dr. Graven's opinion that Boyd coping well with the ongoing litigation and was proactive, compliant, and wants to get better—information that we must assume was gleaned only from the updated FOC report—we are certain the family court's determination would be the same even without considering these facts.

Greene adds that the family court's reliance on the FOC's recommendations and testimony was particularly prejudicial because it placed "great weight on her insights and recommendations." We disagree that the

_____

appointment." But based upon our own review of the record, Young's testimony was overall supportive of primary custody remaining with Boyd. She testified that the children's "sense of home" was in Kentucky and that she had concerns about A.G.'s ability to transition to a new setting.

family court's reliance on the FOC's recommendations requires a reversal because even without the FOC's report there was sufficient evidence to support the court's finding. But we note also that the FOC's recommendation that the children would benefit from Boyd's remaining the primary residential custodian was the same between the original and updated report. As such, the family court was entitled to rely on that recommendation at least insofar as it came from the original report.

Taken together, this evidence is sufficient to uphold the family court's determination. We conclude that even assuming the family court erred in admitting in evidence and relying upon the FOC's updated report without complying with the notice requirement in KRS 403.300, such an error is harmless, considering all the evidence before the family court.

### ii. Expert opinion testimony of the FOC.

Greene also argues that the family court erred in admitting and considering certain statements of the FOC concerning Boyd's mental condition and whether it had any effect on her children. It is undisputed that this issue is preserved for our review.

Specifically, Greene appears to take issue with the following opinion of the FOC, as summarized in the family court's Finding of Fact section:

> Ms. Abbott testified that she had no concerns regarding [Boyd's] mental health at the present time, that she is compliant with her medication and therapy, and that she has a good support system in place. Ms. Abbott testified she did not believe [Boyd's] mental health conditions had any [e]ffect upon the children.

21

The Court of Appeals agreed with Greene that the FOC's testimony contained "expert opinions which she was not qualified to provide[,]" and that the FOC's ability to testify to her opinions about a child's custody conditions are still constrained by the requirements of KRE 701 despite her status as an FOC.

We agree that an FOC's ability to render opinions is constrained by the requirements of KRE 701 and 702. That is, an FOC must still properly be qualified as a medical expert to render medical opinions about the mental health of the parents in a custody proceeding, as Greene argues the FOC did in this case. We reiterate that FOC investigators simply serve the purpose of "investigat[ing] the child's and parents' situations, [filing] a report summarizing his or her findings, and [making] recommendations as to the outcome of the proceeding."[36]

At the same time, this Court has long recognized that trial courts have broad discretion in determining whether expert testimony is admissible.[37] And given the role of an FOC—to investigate and make custodial recommendations to the family court—we think the appointment of an FOC is simultaneously a determination that the FOC possesses the knowledge, skill, and experience

---

[36] *Morgan*, 441 S.W.3d at 111.

[37] *See Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 583 (2000) ("KRE gives the trial court the discretionary authority, reviewable for its abuse, to determine the admissibility of expert testimony in light of the particular facts and circumstances of the particular case. The discretion given to a trial court in determining the admissibility of expert testimony is 'discretion to choose among reasonable means of excluding expertise that is fausse and junky.'").

sufficient to render credible opinions about the fitness of a parent and child's custody arrangements and the ability of parents to care for their child. Such a determination is within the wise discretion of the trial court and may be challenged as such.

But we caution that family courts must be careful to admit those opinions only where they do not cross into the realm of medical-expert testimony, and judges should be particularly vigilant in guarding against those opinions when the medical experts that appeared in the FOC's report do not themselves testify. In this case, although it is close, we believe the FOC's opinion does not cross that line. Specifically, the FOC's testimony that she had no concerns about Boyd's mental health and that she did not believe Boyd's mental health had any effect on her children was not an opinion that required specialized medical knowledge, skill, or experience. Instead, the FOC's opinion was simply a judgment on Boyd's ability to care for her children—an opinion within the realm of a competent FOC's knowledge and experience and one that was rationally based on the FOC's observations of the parties and review of the medical expert's opinions over the course of her investigation.

Accordingly, we hold that the family court did not err in admitting and considering the FOC's statements concerning the mental health of Boyd.

### III. CONCLUSION.

For the foregoing reasons, we affirm the decision of the Court of Appeals. All sitting. All concur.

23

COUNSEL FOR APPELLANT:

Allison Spencer Russell
Simms Russell Law, PLLC

COUNSEL FOR APPELLEE:

James Kennedy Murphy
Hoge Partners, PLLC

COUNSEL FOR AMICUS CURIAE: ATTORNEYS/FOCS REBECCA SMITHER
AND ASHLEY FRANK

James Gregory Troutman
Troutman Law Office, PLLC.