RENDERED: MAY 14, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1270-ME

KENNETH ANDREW ISAACS          APPELLANT

v.        APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE LIBBY G. MESSER, JUDGE
ACTION NO. 18-D-01316-005

JENNIFER LYNETTE MCCLURE          APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, JONES, AND TAYLOR, JUDGES.

JONES, JUDGE: Kenneth Andrew Isaacs (Isaacs) appeals from a domestic violence order (DVO) entered by the Fayette Circuit Court against him on March 2, 2020. After careful review of the entire record and finding no error, we affirm.

## I. BACKGROUND

On October 16, 2019, Jennifer Lynette McClure (McClure) filed a Petition/Motion for Order of Protection (Petition) with the Fayette Circuit Court seeking an emergency protective order (EPO) against Isaacs and requesting a

hearing. An interpersonal protective order (IPO) was granted that same date, with Isaacs ordered to remain five hundred feet away from McClure; to refrain from disposing of or damaging any property of the parties; to refrain from any acts of domestic violence or abuse; and to remain five hundred feet away from the residence known as 832 Lochmere Place, Lexington, Kentucky (Lochmere Residence).

In her Petition McClure alleged, among other things, that Isaacs:

[c]ontinues to have people drive by my house daily and film me [and] watch me [and] my kids[.] So many people that now my neighbors send me the videos of the cars [and the] times they saw them. [Two] times [Isaacs] had an EPO in place and violated it, [he] thinks he is above the law. . . .

He scares my kids [and] me[.] My daughter saw him watching her through her window and is scared to sleep in her room alone.

McClure and Isaacs had been involved in what could fairly be characterized as a complex and volatile relationship. Though the exact nature of that relationship is subject to some dispute, the parties agreed their relationship was sufficient to enable McClure to petition for entry of a DVO against Isaacs.[1]

---

[1] "A petition for an order of protection may be filed by: (a) A victim of domestic violence and abuse; or (b) An adult on behalf of a victim who is a minor otherwise qualifying for relief under this subsection." Kentucky Revised Statutes (KRS) 403.725(1). "Domestic violence" is defined as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or *members of an unmarried couple*." KRS 403.720(1) (emphasis added). A "member of an unmarried couple" means "each member of an

The Petition was not the first litigation between the parties.[2] Though the record of other collateral proceedings is not available on appeal, the testimony at the hearing does establish a rough history. Isaacs originally obtained an EPO against McClure on or about April 16, 2020.[3] Early the following morning, the Fayette County Sheriff's office served the EPO on McClure at the Lochmere Residence and compelled her to leave the premises. The following day, McClure filed for an EPO against Isaacs.[4]

At some point between April 17, 2019, and the hearing in the instant matter, Isaacs sued McClure in a separate civil action in Fayette Circuit Court (the civil action). The civil action concerns the ownership of and right to possess the Lochmere Residence. While that case remains pending, it is undisputed that between McClure's removal from the Lochmere Residence and the filing of the

---

unmarried couple which allegedly has a child in common, any children of that couple, or a member of an unmarried couple who are living together or *have formerly lived together*." KRS 403.720(5) (emphasis added). Based on the record, it appears that Isaacs and McClure formerly resided together for some period of time meaning they meet the definition of an unmarried couple for the purposes of the DVO statutes.

[2] The matter before us bore the case number 18-D-01316-005 and was referred to as "trailer five" in the trial court. The hearing held on January 7, 2020 and March 2, 2020 also concerned 18-D-01316-002, "trailer two," a petition filed by Isaacs against McClure.

[3] Case number 18-D-01316-002 (referred to by the trial court as trailer two).

[4] Case number 18-D-01316-003 (referred to by the trial court trailer three).

instant case on October 19, 2019, she and her children did return and live at that residence while Isaacs lived elsewhere.

The trial court conducted an evidentiary hearing on the Petition on January 7, 2020 and March 2, 2020. Following testimony from both parties and several other witnesses, the trial court entered a DVO against Isaacs.[5] The order was to expire on September 2, 2020.

The trial court sorted the evidence presented by and on behalf of McClure into two broad categories. On the one hand, McClure testified at length concerning Isaacs's conduct during the parties' relationship. McClure downplayed the romantic nature of their time together and instead characterized Isaacs as someone who sought to involve himself in and control every aspect of her life. We need not recount this testimony in detail as the trial court did not rely on any conduct during the relationship to support granting the DVO. In fact, the trial court specifically characterized all or nearly all of McClure's testimony concerning this time period as unreliable. As set forth in a docket order in support of the DVO, the trial court did "not find the testimony of [McClure] to be credible regarding her fear or [Isaacs's] controlling behavior during the relationship."

---

[5] The trial court also heard testimony regarding trailer two. Isaacs was also granted a DVO against McClure at the conclusion of the hearing. Trailer two is not before us on appeal.

In contrast, the trial court did base its ruling on a second broad category of evidence, which concerned Isaacs's behavior after April 17, 2019, the date the legal disputes between the parties began. As this testimony and other evidence formed the basis of the trial court's decision to enter a DVO against Isaacs, it is necessary to consider its nature in greater detail.

McClure testified that since the parties' relationship ended and litigation between them commenced, Isaacs engaged in a pattern of behavior designed to stalk and intimidate her. She described the situation as such:

> He follows [me]. He waits up at the end of my road at the cul-de-sac, comes and watches me through my windows, sends people to watch me, sends people to video me and my kids. I can't even like go outside. I have like thousands and thousands and thousands of videos and text messages from my kids that show it.

McClure also testified that cars drove by her house and filmed her on a regular basis. According to her testimony, this occurred frequently enough that her children began taking videos of the cars that drove by and her neighbors began to use their Ring™ doorbell devices to film passing cars.

McClure did not call any witnesses to testify regarding Isaacs's behavior after April 17, 2019, instead relying solely on her own testimony. In further support of her Petition, McClure testified that Isaacs had been arrested for violating the IPO in the instant case. She also testified that Isaacs would hide in her neighborhood, look into her windows, and knock on the door when she had

-5-

people in the house. More specifically, she described an evening when she returned home from a school auction and was confronted at her front door by Isaacs thirty minutes later.

McClure also testified that Isaacs entered her property and zip-tied roses to her fence after litigation commenced. On cross-examination, however, McClure admitted that she had no first-hand knowledge of how the roses came to be there. She testified that a friend, "Karen," told her she had seen Isaacs put them there.[6]

Additionally, McClure testified that on one occasion David Higdon, an attorney for Isaacs, came to the Lochmere Residence and began filming her and her property. In the conversation that ensued, Higdon stated that he was there at Isaacs's request to monitor work being done on the property.

Significantly, Isaacs disputed some but not all of McClure's testimony. For example, he denied any knowledge of the placement of the roses and testified that he did not direct his attorney to take video of McClure at the house. Despite testifying twice during the hearing, at no time did he address McClure's allegations regarding knocking on her door or looking into her windows. While Isaacs states in his brief that he strongly denied stalking during

---

[6] During the hearing, the trial court commented on the lack of hearsay objections from either attorney.

the hearing, having reviewed the cited portion of the record,[7] we note that his testimony at that time concerned another matter entirely.

The trial court found the testimony concerning Isaacs's activities after the parties ended their relationship compelling. In its docket order granting the DVO, the court noted:

> However, the Ct. finds that after the filing of trailer 002 and 003 [Isaacs] continued to engage in a pattern of conduct tracking [McClure], her comings and goings and activities at the [Lochmere Residence] upon her lawful return thereto that do [sic] constitute [s]talking [b]ehavior and placed [McClure] in reasonable fear for her safety.

Further, the trial court noted: "It is clear that until the legal issues surrounding the house are resolved there is an ongoing risk that this behavior will continue absent an order in this case."

On March 11, 2020, Isaacs timely filed a CR[8] 59.05 "Motion to Reconsider" the trial court's entry of the DVO. Isaacs argued that McClure did not present evidence sufficient to establish the existence of implicit or explicit threats to her and the evidence presented consisted of hearsay.

After a lengthy delay occasioned by COVID-19 protocols, Isaacs's CR 59.05 motion was denied on September 2, 2020, as was McClure's motion to

---

[7] Video Record of March 2, 2020, 2:05:45-2:10:07.

[8] Kentucky Rules of Civil Procedure.

extend the duration of the DVO.

This appeal followed.

## II. STANDARD OF REVIEW

We review the trial court's decision on a petition for a DVO under an abuse of discretion standard. "[T]he test is not whether we would have decided it differently, but whether the court's findings were clearly erroneous or that it abused its discretion." *Gomez v. Gomez*, 254 S.W.3d 838, 842 (Ky. App. 2008) (citation omitted). Findings are not clearly erroneous so long as "they are supported by substantial evidence or, in other words, evidence that when taken alone or in light of all the evidence has sufficient probative value to support the trial court's conclusion." *Rupp v. Rupp*, 357 S.W.3d 207, 208 (Ky. App. 2011) (citation omitted). A trial court's findings of fact are not to be set aside unless clearly erroneous, as the trial court is entitled to due regard to assess the credibility of witnesses. CR 52.01.

## III. ANALYSIS

As an initial matter, we note that the DVO at issue expired on September 2, 2020, nearly a month before the notice of appeal was filed. The trial court declined to extend the DVO at the September 2, 2020, hearing. Generally speaking, "[a]n appellate court is required to dismiss an appeal when a change in circumstance renders that court unable to grant meaningful relief to either party."

*Medical Vision Group, P.S.C. v. Philpot*, 261 S.W.3d 485, 491 (Ky. 2008). The Supreme Court of Kentucky has, however, recognized a "collateral consequences" exception to this doctrine when an adjudication may impact the parties in the future. *Morgan v. Getter*, 441 S.W.3d 94, 99 (Ky. 2014). This Court has previously held that this exception applies to DVO cases as the entry of a DVO may have future consequences for the alleged perpetrator. *Caudill v. Caudill*, 318 S.W.3d 112, 114 (Ky. App. 2010).

The instant case is distinguishable from *Caudill* and *Morgan* in that, here, the DVO expired prior to the filing of the notice appeal as opposed to during the pendency of the appeal. As the rationale behind the collateral consequences exception remains, we do not believe that distinction is material to this analysis.[9] Thus, we are persuaded it is appropriate to decide this appeal on the merits notwithstanding the fact that the DVO has expired.

Isaacs argues that the trial court's ruling is inconsistent with its observations that McClure's testimony concerning the relationship was unreliable. Further, he argues that the evidence concerning stalking after the breakup and

---

[9] We also note that the expiration of the DVO prior to the filing of the notice of appeal is due to the unique circumstances inherent in the COVID-19 pandemic. Isaacs timely filed his CR 59.05 motion but could not have that motion heard for several months due to factors outside the control of the parties and the trial court.

-9-

during the pendency of litigation was largely hearsay, unreliable, and insufficient to support the granting of a DVO.

McClure argues that the court did rely on substantial evidence and therefore did not err. While she recounts evidence which was presented concerning both conduct during the relationship and thereafter, we note that the former did not form the basis of the trial court's analysis and thus we do not consider it.

A court may issue a DVO if it "finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur[.]" KRS[10] 403.740(1). Domestic violence is defined as:

> Physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple.

KRS 403.720(1). While there was no evidence that Isaacs physically harmed or verbally threatened harm to McClure after April 17, 2019, the trial court did rule that his behavior towards McClure amounted to stalking.

For the purposes of granting a DVO, stalking is defined as conduct prohibited under KRS 508.140 or KRS 508.150.

> A person is guilty of stalking in the second degree when he intentionally:

---

[10] Kentucky Revised Statutes.

(a) Stalks another person; and

(b) Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:

      1.    Sexual contact as defined in KRS 510.10;
      2.    Physical injury; or
      3.    Death.

KRS 508.150(1). Stalking in the first-degree requires additional elements, but because a violation of either statute may support a DVO, we analyze this case with the least restrictive statute in mind.

Finally, Kentucky law defines "stalk" as engaging in an intentional course of conduct:

      1.    Directed at a specific person or persons;
      2.    Which seriously alarms, annoys, intimidates, or harasses the person or persons; and
      3.    Which serves no legitimate purpose.

KRS 508.130(1)(a).

A court may issue a DVO following a hearing if it "finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur. . . ." KRS 403.740(1). The trial court issued the DVO against Isaacs as it believed that domestic violence had occurred in the form of stalking and was likely to continue without the trial court's intervention. In determining whether this finding was clearly erroneous, our inquiry is whether it was supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).

Substantial evidence is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion." *Id.*

We have noted repeatedly that trial courts have broad latitude in determining the truthfulness of witnesses. This general rule is certainly applicable in domestic cases. As this Court explained in *Bailey v. Bailey*, 231 S.W.3d 793, 796 (Ky. App. 2007):

> A family court operating as finder of fact has extremely broad discretion with respect to testimony presented, and may choose to believe or disbelieve any part of it. A family court is entitled to make its own decisions regarding the demeanor and truthfulness of witnesses, and a reviewing court is not permitted to substitute its judgment for that of the family court, unless its findings are clearly erroneous.

While we agree with Isaacs that certain portions of McClure's testimony were vague and were not supported by corroborating evidence, we are not persuaded that it logically follows that the trial court was required to discount her entire testimony. "Clearly, the family court was familiar with the history of the parties, and was within its authority to weigh the testimony, make credibility judgments, and conclude that the evidence supported the [issuance] of the DVO." *Baird v. Baird*, 234 S.W.3d 385, 388 (Ky. App. 2007). Similar to the family court in *Baird*, the trial court here was familiar with the parties' history over the course of multiple cases. While the trial court may have doubted the sincerity of McClure's testimony regarding the nature of the parties' relationship prior to their

split, a review of the trial court's findings indicates that it believed McClure's testimony that following the breakup, Isaacs engaged in a pattern of surveilling McClure's movements, prowling around her home, looking into her windows, and making numerous unwanted visits to her residence even though he was prohibited from doing so by the IPO. The trial court was entitled to pick and choose which portions of McClure's testimony, if any, it found credible.

Additionally, while Isaacs adamantly denied the allegations of wrongdoing during the relationship and produced text messages between the parties to bolster his testimony, he did not address many of McClure's allegations concerning his conduct following the parties' breakup, including the fact that he violated the previously issued IPO and/or EPO.

Although we agree with Isaacs that the assertion he entered the property to affix roses to McClure's gate was not supported by competent evidence, there remains more than sufficient evidence on the record to establish the elements of stalking. Taking simply the unchallenged testimony of McClure, the trial court's finding that Isaacs engaged "in a pattern of conduct tracking [McClure], her comings and goings and activities at the [Lochmere Residence]," is not unreasonable. This finding is supported by evidence that Isaacs spent time watching McClure in her neighborhood, looked into her windows, and approached the Lochmere Residence to ring the doorbell. Some or perhaps all of this alleged

behavior occurred while the IPO was in effect, making it more than reasonable that McClure would be fearful of physical injury. Indeed, McClure testified that Isaacs was arrested on at least one occasion for violating the IPO.

Similarly, McClure's testimony establishes a course of conduct as required by KRS 508.130(1)(a). While Isaacs might have persuasively argued that sending his attorney to the property served a legitimate purpose and was therefore outside the meaning of the statute, that appears to be the only evidence of conduct which would potentially fall under that exception.

Taking the evidence into account, the trial court did not abuse its discretion in concluding that Isaacs's behavior established a course of conduct that met the definition of stalking and that, given his arrest for violating the trial court's IPO, it was not unreasonable to assume that absent court intervention the conduct was likely to continue in the future.

## IV. CONCLUSION

For the reasons set forth above, we affirm the Fayette Circuit Court's domestic violence order.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Louis W. Rom
Lexington, Kentucky

BRIEF FOR APPELLEE:

Fred E. Peters
Rhey Mills
Lexington, Kentucky