RENDERED: JANUARY 14, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1363-MR

TARA A. WATKINS                                        APPELLANT

              APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE LAUREN ADAMS OGDEN, JUDGE
                    ACTION NO. 11-CI-503954

STEVEN JOSEPH WILEY                               APPELLEE

AND                       NO. 2020-CA-1442-MR

TARA A. WATKINS                                        APPELLANT

              APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE LAUREN ADAMS OGDEN, JUDGE
                    ACTION NO. 11-CI-503954

STEVEN JOSEPH WILEY; AND
HON. COREY SHIFFMAN                                APPELLEES

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; CETRULO AND McNEILL, JUDGES.

CLAYTON, CHIEF JUDGE:  Tara A. Watkins brings two consolidated appeals from multiple orders of the Jefferson Family Court pertaining to custody, visitation, and child support for her son, T.W.  Tara also challenges the family court's decision not to allow T.W. to testify, its admission of the testimony of T.W.'s counselor, and its imposition of Kentucky Rules of Civil Procedure 11 ("Rule 11") sanctions.   Having reviewed the record and the applicable law, we affirm.

## Factual and Procedural Background

Tara A. Watkins and Steven J. Wiley are the biological parents of T.W., who was born in 2007.  They were not married and never lived together.  Initially, T.W. lived primarily with Tara and Steven had visitation on alternate weekends.  In November 2011, Tara sought custody and child support from Steven in Jefferson Family Court.  She and Steven thereafter entered into an agreement regarding custody, parenting time, and child support which was entered by the family court as an order on December 13, 2011.  Its main provisions were that Tara would "maintain custody" of T.W. and Steven would have reasonable parenting time, including alternate weekends.  Steven was to pay monthly child support of

-2-

$350 dating from November 30, 2011, with an increase to $468 per month beginning on November 11, 2014.

On February 14, 2013, the family court entered an order incorporating another agreement between the parties which resolved issues regarding notice to the other party if one of them intended to move out of state and included an expansion of parenting time for Steven. In May 2014, Steven filed a motion seeking equal timesharing which was denied. According to Tara, Steven stopped paying child support in 2014.

In June 2016, Tara and Steven entered into an agreement concerning timesharing and child support. It stated in pertinent part:

> As of 4/7/16, Steven J. Wiley and Tara A. Watkins consider any and all previous debts in child support reconciled. Mr. Wiley and Ms. Watkins have agreed, in an effort to maximize the quality of life for [T.W.], to amend the court ordered agreement in Jefferson County, KY in regards specifically to child support and visitation between Mr. Wiley and Ms. Watkins.

The agreement described how the parties had forged a working relationship that allowed parenting time to be distributed more evenly. In recognition of this, the agreement provided that "Child support will no longer be paid through the state as Mr. Wiley and Ms. Watkins have agreed to split all costs 50/50 for school, medical, and dental for [T.W.] until [T.W.] reaches the age of 18[.]" T.W. was to continue living primarily with Tara. The agreement specified

that each parent would be responsible for T.W.'s housing, food costs, clothing, and other basic needs while he was in that parent's care and that he could stay at either household at any time.

This 2016 agreement was not filed with the court. During the following two years, T.W. lived with his mother during the week and his father on the weekends, and each parent provided for him while he was staying with them.

In 2018, Tara and Steven agreed to reverse the schedule. T.W. began living with his father during the week and attending school from his home in Shelby County, and staying with his mother on weekends. Steven assumed most of the child's day-to-day care. He scheduled his medical, dental, and counseling appointments, attended school functions, and met with T.W.'s teachers.

The relationship between the parents began to worsen. They argued over T.W.'s access to a cell phone and Steven accused Tara of behaving erratically and being under the influence of drugs. In May 2019, Steven kept T.W. from Tara and refused to allow her any contact with him. On August 15, 2019, the court ordered T.W. to continue living primarily with Steven and with Tara every weekend except for the third weekend of the month.

In October 2019, T.W. ran away from Steven's home, allegedly at Tara's instigation. He was found several miles away at a friend's house. Steven took T.W. to Tara's home and told her "he's your problem now." Tara was living

in Louisville at the time, but she withdrew T.W. from school and moved to Sellersburg, Indiana. Tara explained that she relocated to live with her sister who would help her care for T.W.

Tara thereafter stopped returning T.W. to Steven. Steven filed motions to hold Tara in contempt for refusing to return T.W. and for changing his school.

The family court entered an order on November 5, 2019, requiring the parties to resume the parenting schedule established in its August 15, 2019 order; another order on December 2, 2019, again requiring the parties to follow the parenting schedule and for T.W. to be returned to Steven; and a third on December 16, 2019, allowing Steven to pick up T.W. directly from his school in Indiana because Tara had not followed the previous orders.

On July 14, 2020 and August 14, 2020, the family court held a bifurcated hearing on several outstanding motions, including Steven's motion to modify custody, establish child support, and to hold Tara in contempt and on both parties' motions to modify parenting time. The family court declined to hear testimony from T.W. at the hearing. It did allow testimony from Edwin Raidt, a licensed professional clinical counselor. T.W. had been receiving counseling from Raidt, at the recommendation of his school, since February 2019. Raidt testified at the hearing that T.W. has an adjustment disorder. He has few friends, is socially

disconnected, and possibly suffers from post-traumatic stress disorder ("PTSD"). T.W. told Raidt about several traumatic events he had witnessed in Tara's home, including domestic violence, evidence of drug use, and inadequate food. T.W. told Raidt that he was aware of the ongoing litigation between his parents and just wants it to end. Raidt opined that T.W. exhibits traumatic responses from events that occurred while he was in Tara's care and that his mental health would improve if he spent less time with her.

In its order of August 24, 2020, the family court found that while T.W. was close to both his parents, Steven provided greater stability and that Tara was unaware of the negative impact her behavior was having on T.W. It awarded the parties joint legal custody but gave Steven sole decision-making authority on all issues involving T.W.'s education, medical, and mental health treatment. The parties were given an equal voice in all other major decisions affecting T.W.'s upbringing as well as access to all his providers, teachers, caregivers, and records. T.W. was ordered to live primarily with Steven and with Tara on alternate weekends and certain holidays. Tara was ordered to pay Steven child support of $329.70 per month in accordance with the Kentucky Child Support Guidelines. The family court also found Tara to be in contempt of court for failing to obey its order to communicate with T.W. exclusively through AppClose between the hours of 7:00 a.m. and 10:00 p.m., finding that she was contacting Steven, Steven's wife,

and T.W. at all hours of the day. The court held that she could purge herself of contempt by strictly complying with the court's communication orders in the future.

Tara filed a motion to alter, amend, or vacate; for additional findings; and/or for a new trial. She argued, among other things, that the family court erred in not allowing T.W. to testify and in allowing Raidt to testify. She disputed the award of child support and contended that Steven owed her a child support arrearage which had accumulated from 2014, when Steven stopped paying the support due under the 2011 order. The family court denied the motion in an order entered on September 29, 2020. Tara thereafter filed an appeal (No. 2020-CA-1363-MR).

Meanwhile, on September 14, 2020, Tara filed a motion for a common law judgment against Steven for the child support arrearage in the amount of $18,900. She also filed a motion for contempt for denying her telephonic access to T.W. On September 25, 2020, Steven filed motions for contempt, for immediate suspension of unsupervised parenting time, and for Rule 11 sanctions and attorney's fees.

The family court entered an order on October 8, 2020, in which it held that Steven had no obligation to pay child support after June 7, 2016, and that he had no arrearage prior to that date. It ordered supervised visitation for Tara and

granted Rule 11 sanctions, ordering Tara to pay $1500 in attorney's fees. Tara thereafter filed a motion to alter, amend, or vacate, which the family court denied in an order entered on October 29, 2020. Tara filed an appeal (No. 2020-CA-1442-MR).

## Standard of Review

The decision of a family court regarding custody or visitation/timesharing may only be reversed "if it constitutes a manifest abuse of discretion." *Hempel v. Hempel*, 380 S.W.3d 549, 551 (Ky. App. 2012) (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted). "If the factual findings underlying the court's determination are supported by substantial evidence, we may not interfere with the family court's exercise of its discretion." *Hempel*, 380 S.W.3d at 551. Furthermore, "[d]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Humphrey v. Humphrey*, 326 S.W.3d 460, 463 (Ky. App. 2010).

## Appeal No. 2020-CA-1363-MR

Tara argues that the family court erred when it modified and reduced her parenting time with T.W. to alternate weekends. Previously, she had parenting time with T.W. every weekend except for the third weekend of each month.

Kentucky Revised Statutes (KRS) 403.320(3) provides: "The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral, or emotional health." "[T]he term 'restrict' means to provide [either] parent with something less than 'reasonable visitation.'" *Layman v. Bohanon*, 599 S.W.3d 423, 429 (Ky. 2020) (quoting *French v. French*, 581 S.W.3d 45, 50 (Ky. App. 2019)). "Accordingly, under KRS 403.320(3), a court can modify timesharing if it is in the best interests of the child, but it can only order a 'less than reasonable' timesharing arrangement if the child's health is seriously endangered." *Id.*

Tara argues that because she did not receive equal parenting time, the court was obligated to find that the visitation with her would endanger T.W.'s health in order to support the modification. She relies on KRS 403.270, which states that, in determining custody, there is a rebuttable presumption "that joint custody and equally shared parenting time is in the best interest of the child." KRS 403.270(2).

But the Kentucky Supreme Court has held that the presumption set forth in KRS 403.270(2) applies only in the context of an initial custody determination, whereas the timesharing modification statute, KRS 403.320(3),

"does *not* impose a presumption of joint custody and equal parenting time."

*Layman*, 599 S.W.3d at 430.

In the context of a modification of timesharing/parenting time, "[t]here is no set formula for determining whether a modified timesharing arrangement is reasonable; rather, it is a matter that must be decided based upon the unique circumstances of each case." *Id.* at 432. Furthermore, "it does not necessarily mean that a parent has less than reasonable timesharing just because he or she spends less time with the child than under the original timesharing arrangement." *Id*.

The family court recognized that Tara loves T.W. and that he is bonded to her and enjoys spending time with her and her extended family. The court found, however, that Tara's recent behaviors were troubling and warranted a reduction in parenting time. It based this decision on evidence that Tara often fails to exercise her parenting time or leaves T.W. with her parents; that her text messages to T.W. involve him in adult conflicts; that she encourages him to lie and engage in high risk behaviors; that she has been unable to maintain a stable home or employment for the past few years; and that T.W. witnessed domestic violence and possible drug use in her home and Tara has not recognized he was traumatized by these experiences. By contrast, Steven's situation is more stable. He lives in a single-family home with his wife and their infant son. He works daily from

-10-

Monday through Friday; his wife works from home and is able to care for the children during the day. In light of these findings, which are supported by substantial evidence in the record, the family court's decision to award Tara less than equal parenting time was not unreasonable. Consequently, the court was not required to find that visitation with Tara would endanger T.W.'s health.

Next, Tara argues that the family court's decision not to hear testimony from T.W. violated his due process right to present his wishes and his perspective on the situation. T.W. was thirteen years of age at the time of the hearing. He was represented by a guardian *ad litem* throughout the proceedings.

In determining the best interest of the child, the court is expressly directed by statute to consider the child's own wishes. KRS 403.270(2)(b). A court is permitted to interview a child in chambers to ascertain the child's wishes as to his custodian and as to visitation. KRS 403.290(1). Such an interview is not, however, mandatory and rests within the trial court's sound discretion. *Addison v. Addison*, 463 S.W.3d 755, 763 (Ky. 2015); KRS 403.290(1). "The elementary principles of humanitarianism are so strongly against the placing of a child between its parents that we feel a trial court should have a wide latitude in protecting the child." *Id*. at 764 (quoting *Parker v. Parker*, 467 S.W.2d 595, 597 (Ky. 1971)).

Thus, while a child is permitted to testify at such a hearing, the court is not required to admit such testimony. Tara argues the family court's decision impinges upon a parent's interest in the care, custody, and control of their children, one of the oldest of the fundamental liberty interests, as recognized by the United States Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). She relies upon *Morgan v. Getter*, 441 S.W.3d 94, 104 (Ky. 2014), which recognized the trial court's delicate task of determining the child's best interest while at the same time ensuring a fundamentally fair proceedings for the parents. *Id.* at 114.

But *Troxel* and *Morgan* do not expand the fundamental liberty interest of the parent to the extent of mandating that a child must testify in custody or visitation proceedings. The family court in this case decided that the potential emotional harm T.W. might suffer by being called to testify outweighed any probative value his testimony may have had. The family court also noted that it had the benefit of reports from T.W.'s therapist and guardian *ad litem*, with the latter reporting that T.W. wanted to spend more time with Tara. Thus, the family court was aware of T.W.'s preferences. The family court's decision that T.W.'s independent testimony would be of no further assistance to the court was well within its discretion and will not be reversed on appeal.

Watkins further argues that the family court erred in allowing Edwin Raidt, T.W.'s therapist, to testify about statements made to him by T.W. and to opine about T.W.'s psychological disorders. Specifically, she objects to Raidt's testimony that T.W. may have an adjustment disorder and possibly suffers from PTSD. Watkins argues that Raidt was not qualified to render an opinion on these matters because he is a school counselor, not a psychologist or psychiatrist.

The family court held that Raid was qualified to testify as an expert because he is licensed by the Commonwealth of Kentucky as a Licensed Professional Clinical Counselor, pursuant to KRS 335.500. The court described the LPCC designation as "an unrestricted credential . . . which allows Raidt to treat patients independently." "Licensed professional clinical counselor" is defined as "a credential holder who has been determined by the [Kentucky Board of Licensed Professional Counselors] to have met all qualifications set forth in KRS 335.525(1) to engage in the independent practice of professional counseling[.]" KRS 335.500(3). On this basis the family court concluded that Raidt was qualified to testify that T.W. exhibited signs of trauma and suffered from an adjustment disorder.

In deciding custody and visitation, "[t]he court may seek the advice of professional personnel, whether or not employed by the court on a regular basis. The advice given shall be in writing and made available by the court to counsel

upon request. Counsel may examine as a witness any professional personnel consulted by the court." KRS 403.290(2).

"A trial court's determination as to whether a witness is qualified to give expert testimony under [Kentucky Rules of Evidence] 702 is subject to an abuse of discretion standard[.]" *Tapp v. Owensboro Medical Health Systems, Inc.*, 282 S.W.3d 336, 339 (Ky. App. 2009).

Raidt holds a master's degree in counseling psychology and is a board-certified clinical counselor with advanced training in trauma and autism. He has been in private practice since 2013 as a therapist working for Shelby County Associates and as a mental health consultant for Shelby County Public Schools. Raidt has been meeting with T.W. every other week since February 9, 2019, with a break when Tara and then Steven withheld him from counseling.

Tara argues that the situation is analogous to that in *Brosnan v.Brosnan*, in which a panel of this Court held that the family court abused its discretion in allowing a social worker to testify that she had diagnosed and treated a litigant for PTSD because the social worker was not "trained as a psychologist or psychiatrist" and did not have "the appropriate education and training to diagnose psychological disorders, including PTSD[.]" 359 S.W.3d 480, 485 (Ky. App. 2012).

Raidt is not a practicing psychologist, although he has advanced training in trauma and autism. Although the family court's order mentioned that Raidt had diagnosed T.W. with an adjustment disorder and has not ruled out PTSD, this proposed diagnosis was not key to the family court's decision regarding visitation. Instead, the family court relied primarily on Raidt's testimony about T.W.'s unhappiness stemming from the conflict between his parents and the disturbing occurrences T.W. had witnessed while living with his mother. This testimony was well within Raidt's expertise as a counselor, and the family court did not abuse its discretion in deciding that his opinions, based on months of counseling with T.W., provided a helpful perspective on T.W.'s best interests.

Moreover, Raidt's testimony was supported by evidence in Tara's text messages that she involves T.W. in her disputes with Steven. The family court reported that in a recent exchange of text messages, Tara told T.W. that she lost her home in Louisville because it was what T.W. wanted, stating, "You've cost me money, time, and so much more that you don't appreciate. So stop asking me for money, . . . I'm done." She told T.W. that he did not appreciate her and that if he chose to live with his father, he would have to stay there until he was eighteen. She threatened to send the police to pick T.W. up when he said he did not want to see her.

Tara also challenges the reliability of Raidt's testimony and his interpretation of T.W.'s behavior. For example, she argues that his description of T.W.'s poor eye contact was attributable to T.W. being "jerked from school to school" by Steven. Tara was afforded ample opportunity to challenge Raidt's testimony and to provide her own testimony and evidence regarding her relationship with T.W. "The trier of fact may believe any witness in whole or in part. The trier of fact may take into consideration all the circumstances of the case, including the credibility of the witness." *Bissell v. Baumgardner*, 236 S.W.3d 24, 29-30 (Ky. App. 2007).

The admission of Raidt's testimony and the family court's decision that it was credible and reliable did not constitute an abuse of discretion.

Tara argues that the family court erred in ordering her to pay child support of $329.70 per month, effective August 24, 2020. Pursuant to their 2016 agreement, neither she nor Steven had been paying child support. The agreement expressly provided that as of April 7, 2016, Tara and Steven "consider[ed] any and all previous debts in child support reconciled." She contends that by requiring her to pay child support, the family court had essentially discarded the 2016 agreement and consequently she was entitled to seek unpaid child support pursuant to the previous 2011 agreement. She invokes the doctrine of unclean hands to argue that

Steven should not be allowed to use the 2016 agreement as a shield to avoid paying this prior arrearage.

In awarding child support to Steven, the family court acknowledged that neither party was paying child support in accordance with their 2016 agreement. It further noted, however, that although parties are free to enter into settlement agreements, the court retains control over custody, support, and visitation, and is not bound by agreements in those areas. Under the terms of KRS 403.180, "while the parties are free to enter into a separation agreement to promote settlement of the divorce, the court still retains control over child custody, support, and visitation and is not bound by the parties' agreement in those areas." *Tilley v. Tilley*, 947 S.W.2d 63, 65 (Ky. App. 1997). Furthermore, "a parent's obligation to support a child may not be absolutely waived by any contract between the parties." *Whicker v. Whicker*, 711 S.W.2d 857, 859 (Ky. App. 1986). At the time the parties entered into the agreement waiving support, they anticipated a flexible parenting schedule with T.W. spending time in each household. As it turned out, T.W. lived primarily with one parent or the other since the agreement was executed. Since 2018, he had been living primarily with Steven who had provided for the bulk of his financial needs. The court deemed this a substantial and continuing change in circumstances which warranted a modification of support. In deciding to modify

-17-

support in the light of these changed circumstances, the family court correctly held that it was not bound by the terms of any earlier agreements.

## Appeal No. 2020-CA-1442-MR

In her second appeal, Tara argues that the family court erred in stating she was not entitled to a common law judgment for child support arrearage without a hearing. In its order, the family court restated many of the principles it set forth in its September 29, 2020, order denying Tara's motion to alter, amend, or vacate. It reiterated that Steven had no obligation to pay child support after June 7, 2016 under the terms of the agreement he and Tara entered into on that date. Under its terms, the parties did not "waive" child support but instead agreed to pay an equal amount of T.W.'s expenses directly. Nor did they "waive" any child support arrearage. Instead, they agreed that all past due child support "had been reconciled." The family court's analysis of the agreement is fully in accordance with our case law and with the terms of the agreement itself. Furthermore, Tara has offered no convincing reasons why a hearing on this issue was required.

Tara argues that the family court erred in imposing Rule 11 sanctions and ordering her to pay $1500 in fees to Steven's attorney for filing her motion for a common law judgment for past due child support. She contends that Rule 11 sanctions may not be imposed on a party merely for being on the wrong side of a legal argument.

-18-

Rule 11 states in part as follows:

> Every pleading, motion and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. . . . The signature of an attorney or party constitutes a certification by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

"CR 11 does not provide substantive rights to litigants but is a procedural rule designed to curb abusive conduct in the litigation process." *Lexington Inv. Co. v. Willeroy*, 396 S.W.3d 309, 312 (Ky. App. 2013) (citing *Clark Equipment Co., Inc. v. Bowman*, 762 S.W.2d 417, 420 (Ky. App. 1988)). "It is intended only for exceptional circumstances." *Id.* "The test to be used by the trial court in considering a motion for sanctions is whether the attorney's conduct, at the time he or she signed the allegedly offending pleading or motion, was reasonable under the circumstances." *Id.* at 312-13.

On July 3, 2020, Tara filed a motion for summary judgment in which she invoked the 2016 agreement to argue that Steven was not entitled to child support, and that he in fact had relied on the 2016 agreement to oppose a motion for child support which she filed in 2019. The family court entered its order requiring Tara to pay child support on August 24, 2020. On September 3, 2020, Tara filed her motion to alter, amend, or vacate that order in which she raised the argument regarding the purported arrearage stemming from the 2011 agreement. She filed her motion seeking the common law judgment for the child support arrearage ten days later, on September 14, 2020, before the court had even ruled on the motion to alter, amend, or vacate. The family court's order imposing the sanctions stated that Tara's motion "was not grounded in law or fact" and that she relied on the 2016 agreement for more than nine years during which time she never sought to enforce the prior order of support entered in 2011. The family court further noted that Tara had been represented by counsel throughout the proceedings and had competent legal assistance.

Tara sought the common law judgment for the arrearage before the family court had even had an opportunity to rule on her motion to alter, amend, or vacate raising the issue. Its decision to impose sanctions was not an abuse of discretion.

**Conclusion**

For the foregoing reasons, the Jefferson Family Court's orders in

Appeal No. 2020-CA-1363-MR and Appeal No. 2020-CA-1442-MR are affirmed.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Harold L. Storment
Louisville, Kentucky

BRIEF FOR APPELLEE STEVEN
JOSEPH WILEY:

Corey Shiffman
Nicholas A. Wheatley
Louisville, Kentucky